## NEW YORK ET AL. v. UNITED STATES.

No. 5.   Argued December 7, 8, 1944.   Reargued December 4, 1945.—
Decided January 14, 1946.

*Henry S. Manley,* Assistant Attorney General of New York, with whom *Nathaniel L. Goldstein,* Attorney General, *Orrin G. Judd,* Solicitor General, and *Wendell P. Brown,* First Assistant Attorney General, were on the brief, for the State of New York; and *Mr. Irving I. Goldsmith* was on the brief for the Saratoga Springs Commission and Saratoga Springs Authority, petitioners.

*Mr. Paul A. Freund,* with whom *Solicitor General Fahy, Assistant Attorney General Samuel O. Clark, Jr., Messrs. Sewall Key, Paul R. Russell* and *Miss Helen R. Carloss* were on the brief, for the United States.

*Orrin G. Judd,* Solicitor General of New York, with whom *Nathaniel L. Goldstein,* Attorney General, *Wendell P. Brown,* First Assistant Attorney General, and *Henry S. Manley,* Assistant Attorney General, were on the brief, for the State of New York.

*Mr. Paul A. Freund,* with whom *Solicitor General McGrath, Assistant Attorney General Samuel O. Clark, Jr., Messrs. Sewall Key* and *Bernard Chertcoff* were on the brief, for the United States.

By special leave of Court, *Greek L. Rice,* Attorney General of Mississippi, argued the cause for the following States as *amici curiae:* Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The Attorneys General of those States, together with *Messrs. Austin J. Tobin* and *Leander I. Shelley,* joined in the brief.

Separate briefs were also filed on behalf of the States of Illinois and Pennsylvania; the City of New York and the National Institute of Municipal Law Officers; and the American Public Power Association, as *amici curiae.*

MR. JUSTICE FRANKFURTER announced the judgment of the Court and delivered an opinion in which MR. JUSTICE RUTLEDGE joined.

Section 615 (a) (5) of the 1932 Revenue Act, 47 Stat. 169, 264, imposed a tax on mineral waters.[1] The United States brought this suit to recover taxes assessed against the State of New York on the sale of mineral waters taken

---

[1] "SEC. 615. Tax on Soft Drinks.

"(a) There is hereby imposed— . . .

"(5) Upon all natural or artificial mineral waters or table waters, whether carbonated or not, and all imitations thereof, sold by the producer, bottler, or importer thereof, in bottles or other closed containers, at over 12½ cents per gallon, a tax of 2 cents per gallon."

from Saratoga Springs, New York.[2] The State claims immunity from this tax on the ground that "in the bottling and sale of the said waters the defendant State of New York was engaged in the exercise of a usual, traditional and essential governmental function." The claim was rejected by the District Court and judgment went for the United States. 48 F. Supp. 15. The judgment was affirmed by the Circuit Court of Appeals for the Second Circuit. 140 F. 2d 608. The strong urging of New York for further clarification of the amenability of States to the taxing power of the United States led us to grant certiorari. 322 U. S. 724. After the case was argued at the 1944 Term, reargument was ordered.

On the basis of authority the case is quickly disposed of. When States sought to control the liquor traffic by going into the liquor business, they were denied immunity from federal taxes upon the liquor business. *South Caro-*

---

[2] The history of New York's relations to the springs at Saratoga may be briefly summarized. Under previous private operation the flow of the springs had been substantially diminished by excessive pumping. In 1911 the State of New York began to acquire title to all the lands on which the mineral springs were located at Saratoga Springs. In order to conserve the springs for beneficial operation, the State took various measures until, in 1930, control over the springs in the State Reservation was given to the newly created Saratoga Springs Commission. In 1933, the Commission leased the springs' facilities and delegated their management to the Saratoga Springs Authority, a public benefit corporation of New York.

During the years 1932 to 1934, for which the tax is asserted, the Commission and the Authority operated the Reservation as a health resort and spa. There are recreation facilities, bath houses, drink halls, a research laboratory, and other buildings on the grounds. Some of the mineral waters of the springs that have a medicinal value are bottled and sold to distributors, retailers, and directly to consumers. The sales are promoted by advertising and customarily yield a profit which is applied to meeting in part the expenses of operating the other facilities. The remainder of those expenses is met by annual legislative appropriations.

*lina* v. *United States,* 199 U. S. 437; *Ohio* v. *Helvering,* 292 U. S. 360. And in rejecting a claim of immunity from federal taxation when Massachusetts took over the street railways of Boston, this Court a decade ago said: "We see no reason for putting the operation of a street railway [by a State] in a different category from the sale of liquors." *Helvering* v. *Powers,* 293 U. S. 214, 227. We certainly see no reason for putting soft drinks in a different constitutional category from hard drinks. See also *Allen* v. *Regents,* 304 U. S. 439.

One of the greatest sources of strength of our law is that it adjudicates concrete cases and does not pronounce principles in the abstract. But there comes a time when even the process of empiric adjudication calls for a more rational disposition than that the immediate case is not different from preceding cases. The argument pressed by New York and the forty-five other States who, as *amici curiae,* have joined her deserves an answer.

Enactments levying taxes made in pursuance of the Constitution are, as other laws are, "the supreme Law of the Land." Art. VI, Constitution of the United States; *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 153. The first of the powers conferred upon Congress is the power "To lay and collect Taxes, Duties, Imposts and Excises . . ." Art. I, § 8. By its terms the Constitution has placed only one limitation upon this power, other than limitations upon methods of laying taxes not here relevant: Congress can lay no tax "on Articles exported from any State." Art. I, § 9. Barring only exports, the power of Congress to tax "reaches every subject." *License Tax Cases,* 5 Wall. 462, 471. But the fact that ours is a federal constitutional system, as expressly recognized in the Tenth Amendment, carries with it implications regarding the taxing power as in other aspects of government. See, *e. g., Hopkins Savings Assn.* v. *Cleary,* 296 U. S. 315. Thus, for Congress to tax State activities while leaving

untaxed the same activities pursued by private persons would do violence to the presuppositions derived from the fact that we are a Nation composed of States.

But the fear that one government may cripple or obstruct the operations of the other early led to the assumption that there was a reciprocal immunity of the instrumentalities of each from taxation by the other. It was assumed that there was an equivalence in the implications of taxation by a State of the governmental activities of the National Government and the taxation by the National Government of State instrumentalities. This assumed equivalence was nourished by the phrase of Chief Justice Marshall that "the power to tax involves the power to destroy." *McCulloch* v. *Maryland,* 4 Wheat. 316, 431. To be sure, it was uttered in connection with a tax of Maryland which plainly discriminated against the use by the United States of the Bank of the United States as one of its instruments. What he said may not have been irrelevant in its setting. But Chief Justice Marshall spoke at a time when social complexities did not so clearly reveal as now the practical limitations of a rhetorical absolute. See Holmes, J., in *Long* v. *Rockwood,* 277 U. S. 142, 148, and in *Panhandle Oil Co.* v. *Mississippi,* 277 U. S. 218, 223. The phrase was seized upon as the basis of a broad doctrine of intergovernmental immunity, while at the same time an expansive scope was given to what were deemed to be "instrumentalities of government" for purposes of tax immunity. As a result, immunity was until recently accorded to all officers of one government from taxation by the other, and it was further assumed that the economic burden of a tax on any interest derived from a government imposes a burden on that government so as to involve an interference by the taxing government with the functioning of the other government. See *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514; *Helvering* v. *Producers Corp.,* 303 U. S. 376; *Graves* v. *N. Y. ex rel. O'Keefe,* 306 U. S. 466, 480–81.

To press a juristic principle designed for the practical affairs of government to abstract extremes is neither sound logic nor good sense. And this Court is under no duty to make law less than sound logic and good sense. When this Court for the first time relieved State officers from a non-discriminatory Congressional tax, not because of anything said in the Constitution but because of the supposed implications of our federal system, Mr. Justice Bradley pointed out the invalidity of the notion of reciprocal intergovernmental immunity. The considerations bearing upon taxation by the States of activities or agencies of the federal government are not correlative with the considerations bearing upon federal taxation of State agencies or activities. The federal government is the government of all the States, and all the States share in the legislative process by which a tax of general applicability is laid. "The taxation by the State governments of the instruments employed by the general government in the exercise of its powers," said Mr. Justice Bradley, "is a very different thing. Such taxation involves an interference with the powers of a government in which other States and their citizens are equally interested with the State which imposes the taxation." [3] Since then we have moved

---

[3] The views of Mr. Justice Bradley have been so vindicated by time and experience that his whole compact opinion deserves to be recalled:

"I dissent from the opinion of the court in this case, because, it seems to me that the general government has the same power of taxing the income of officers of the State governments as it has of taxing that of its own officers. It is the common government of all alike; and every citizen is presumed to trust his own government in the matter of taxation. No man ceases to be a citizen of the United States by being an officer under the State government. I cannot accede to the doctrine that the general government is to be regarded as in any sense foreign or antagonistic to the State governments, their officers, or people; nor can I agree that a presumption can be admitted that the general government will act in a manner hostile to the existence or

away from the theoretical assumption that the National Government is burdened if its functionaries, like other citizens, pay for the upkeep of their State governments, and we have denied the implied constitutional immunity of federal officials from State taxes. *Graves* v. *N. Y. ex rel. O'Keefe, supra.* See *Gillespie* v. *Oklahoma,* 257 U. S. 501, criticized in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 401, and explicitly overruled in *Helvering* v. *Producers Corp.,* 303 U. S. 376; *Long* v. *Rockwood,* 277 U. S. 142, overruled in *Fox Film Corp.* v. *Doyal,* 286 U. S. 123; *Collector* v. *Day,* 11 Wall. 113, and *New York ex rel. Rogers* v. *Graves,* 299 U. S. 401, overruled in *Graves* v. *N. Y. ex rel. O'Keefe, supra.*

In the meantime, cases came here, as we have already noted, in which States claimed immunity from a federal

functions of the State governments, which are constituent parts of the system or body politic forming the basis on which the general government is founded. The taxation by the State governments of the instruments employed by the general government in the exercise of its powers, is a very different thing. Such taxation involves an interference with the powers of a government in which other States and their citizens are equally interested with the State which imposes the taxation. In my judgment, the limitation of the power of taxation in the general government, which the present decision establishes, will be found very difficult of control. Where are we to stop in enumerating the functions of the State governments which will be interfered with by Federal taxation? If a State incorporates a railroad to carry out its purposes of internal improvement, or a bank to aid its financial arrangements, reserving, perhaps, a percentage on the stock or profits, for the supply of its own treasury, will the bonds or stock of such an institution be free from Federal taxation? How can we now tell what the effect of this decision will be? I cannot but regard it as founded on a fallacy, and that it will lead to mischievous consequences. I am as much opposed as any one can be to any interference by the general government with the just powers of the State governments. But no concession of any of the just powers of the general government can easily be recalled. I, therefore, consider it my duty to at least record my dissent when such concession appears to be made. An extended discussion of the subject would answer no useful purpose." *Collector* v. *Day,* 11 Wall. 113, 128–29.

tax imposed generally on enterprises in which the State itself was also engaged. This problem did not arise before the present century, partly because State trading did not actively emerge until relatively recently, and partly because of the narrow scope of federal taxation. In *South Carolina* v. *United States,* 199 U. S. 437, immunity from a federal tax on a dispensary system, whereby South Carolina monopolized the sale of intoxicating liquors, was denied by drawing a line between taxation of the historically recognized governmental functions of a State, and business engaged in by a State of a kind which theretofore had been pursued by private enterprise. The power of the federal government thus to tax a liquor business conducted by the State was derived from an appeal to the Constitution "in the light of conditions surrounding at the time of its adoption." *South Carolina* v. *United States, supra,* at 457. That there is a constitutional line between the State as government and the State as trader, was still more recently made the basis of a decision sustaining a liquor tax against Ohio. "If a state chooses to go into the business of buying and selling commodities, its right to do so may be conceded so far as the Federal Constitution is concerned; but the exercise of the right is not the performance of a governmental function . . . When a state enters the market place seeking customers it divests itself of its *quasi* sovereignty *pro tanto,* and takes on the character of a trader, so far, at least, as the taxing power of the federal government is concerned." *Ohio* v. *Helvering, supra,* at 369. When the *Ohio* case was decided it was too late in the day not to recognize the vast extension of the sphere of government, both State and National, compared with that with which the Fathers were familiar. It could hardly remain a satisfactory constitutional doctrine that only such State activities are immune from federal taxation as were engaged in by the States in 1787. Such a static concept of government denies *its* essential nature. "The science of government is the most abstruse

of all sciences; if, indeed, that can be called a science which has but few fixed principles, and practically consists in little more than the exercise of a sound discretion, applied to the exigencies of the state as they arise. It is the science of experiment." *Anderson* v. *Dunn,* 6 Wheat. 204, 226.

When this Court came to sustain the federal taxing power upon a transportation system operated by a State, it did so in ways familiar in developing the law from precedent to precedent. It edged away from reliance on a sharp distinction between the "governmental" and the "trading" activities of a State, by denying immunity from federal taxation to a State when it "is undertaking a business enterprise of a sort that is normally within the reach of the federal taxing power and is distinct from the usual governmental functions that are immune from federal taxation in order to safeguard the necessary independence of the State." *Helvering* v. *Powers, supra,* at 227. But this likewise does not furnish a satisfactory guide for dealing with such a practical problem as the constitutional power of the United States over State activities. To rest the federal taxing power on what is "normally" conducted by private enterprise in contradiction to the "usual" governmental functions is too shifting a basis for determining constitutional power and too entangled in expediency to serve as a dependable legal criterion. The essential nature of the problem cannot be hidden by an attempt to separate manifestations of indivisible governmental powers. See Wambaugh, *Present Scope of Government* (1897) 20 A. B. A. Rep. 307; Frankfurter, *The Public and its Government* (1930).

The present case illustrates the sterility of such an attempt.[4] New York urges that in the use it is making of

---

[4] This method of solving a problem inherent in a federal constitutional system has been found equally inconclusive in Latin America. See Amadeo, Argentine Constitutional Law (1943) 97–103.

Saratoga Springs it is engaged in the disposition of its natural resources. And so it is. But in doing so it is engaged in an enterprise in which the State sells mineral waters in competition with private waters, the sale of which Congress has found necessary to tap as a source of revenue for carrying on the National Government. To say that the States cannot be taxed for enterprises generally pursued, like the sale of mineral water, because it is somewhat connected with a State's conservation policy, is to invoke an irrelevance to the federal taxing power. Liquor control by a State certainly concerns the most important of a State's natural resources—the health and well-being of its people. See *Mugler* v. *Kansas,* 123 U. S. 623, 662; *Crane* v. *Campbell,* 245 U. S. 304, 307. If in its wisdom a State engages in the liquor business and may be taxed by Congress as others engaged in the liquor business are taxed, so also Congress may tax the States when they go into the business of bottling water as others in the mineral water business are taxed even though a State's sale of its mineral waters has relation to its conservation policy.

In the older cases, the emphasis was on immunity from taxation. The whole tendency of recent cases reveals a shift in emphasis to that of limitation upon immunity. They also indicate an awareness of the limited rôle of courts in assessing the relative weight of the factors upon which immunity is based. Any implied limitation upon the supremacy of the federal power to levy a tax like that now before us, in the absence of discrimination against State activities, brings fiscal and political factors into play. The problem cannot escape issues that do not lend themselves to judgment by criteria and methods of reasoning that are within the professional training and special competence of judges. Indeed the claim of implied immunity by States from federal taxation raises questions not wholly unlike provisions of the Constitution, such as

that of Art. IV, § 4, guaranteeing States a republican form of government, see *Pacific States Tel. & Tel. Co.* v. *Oregon,* 223 U. S. 118, which this Court has deemed not within its duty to adjudicate.

We have already held that by engaging in the railroad business a State cannot withdraw the railroad from the power of the federal government to regulate commerce. *United States* v. *California,* 297 U. S. 175. See also *University of Illinois* v. *United States,* 289 U. S. 48. Surely the power of Congress to lay taxes has impliedly no less a reach than the power of Congress to regulate commerce. There are, of course, State activities and State-owned property that partake of uniqueness from the point of view of intergovernmental relations. These inherently constitute a class by themselves. Only a State can own a Statehouse; only a State can get income by taxing. These could not be included for purposes of federal taxation in any abstract category of taxpayers without taxing the State as a State. But so long as Congress generally taps a source of revenue by whomsoever earned and not uniquely capable of being earned only by a State, the Constitution of the United States does not forbid it merely because its incidence falls also on a State. If Congress desires, it may of course leave untaxed enterprises pursued by States for the public good while it taxes like enterprises organized for private ends. Cf. *Springfield Gas Co.* v. *Springfield,* 257 U. S. 66; *University of Illinois* v. *United States, supra,* at 57; *Puget Sound Co.* v. *Seattle,* 291 U. S. 619. If Congress makes no such differentiation and, as in this case, taxes all vendors of mineral water alike, whether State vendors or private vendors, it simply says, in effect, to a State: "You may carry out your own notions of social policy in engaging in what is called business, but you must pay your share in having a nation which enables you to pursue your policy." After all, the representatives of all the States, having, as the appearance

of the Attorneys General of forty-six States at the bar of this Court shows, common interests, alone can pass such a taxing measure and they alone in their wisdom can grant or withhold immunity from federal taxation of such State activities.

The process of Constitutional adjudication does not thrive on conjuring up horrible possibilities that never happen in the real world and devising doctrines sufficiently comprehensive in detail to cover the remotest contingency. Nor need we go beyond what is required for a reasoned disposition of the kind of controversy now before the Court. The restriction upon States not to make laws that discriminate against interstate commerce is a vital constitutional principle, even though "discrimination" is not a code of specifics but a continuous process of application. So we decide enough when we reject limitations upon the taxing power of Congress derived from such untenable criteria as "proprietary" against "governmental" activities of the States, or historically sanctioned activities of government, or activities conducted merely for profit,[5] and find

[5] Attempts along similar lines to solve kindred problems arising under the Canadian and Australian Constitutions have also proved a barren process. See Australia Constitution Act, 1900, § 114, in Egerton, Federations and Unions in the British Empire (2d ed., 1924) 225; Pond, Intergovernmental Immunity: A Comparative Study of the Federal System (1941) 26 Iowa L. Rev. 272; Kennedy & Wells, The Law of the Taxing Power in Canada (1931) 35–37.

Even where the Constitution of a federal system explicitly deals with the problem of intergovernmental taxation, as in Brazil, litigation is not escaped and nice distinctions have to be made. See cases arising under Article 10 of the Constitution of 1891 and under Article 32 of the Constitution of 1937: Appellação Civel, No. 2.884, 13 Revista do Supremo Tribunal 203 (1917); Appellação Civel, No. 2.900, 14 Revista do Supremo Tribunal 44 (1918); Appellação Civel, No. 2.536, 19 Revista do Supremo Tribunal 76 (1919); Recurso de mandado de segurança No. 617, 56 Archivo Judiciario 1 (1940); Agravo de petição, No. 8.024, 59 Archivo Judiciario 85 (1941). Article 32 of the Constitution of 1937, the present Brazilian Constitution, provides: "The Union, the States and the Municipalities are forbidden: . . . c) to

no restriction upon Congress to include the States in levying a tax exacted equally from private persons upon the same subject matter.

*Judgment affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE RUTLEDGE, concurring.

I join in the opinion of MR. JUSTICE FRANKFURTER and in the result. I have no doubt upon the question of power. The shift from immunity to taxability has gone too far, and with too much reason to sustain it, as respects both state functionaries and state functions, for backtracking to doctrines founded in philosophies of sovereignty more current and perhaps more realistic in an earlier day. Too much is, or may be, at stake for the nation to permit relieving the states of their duty to support it, financially as otherwise, when they take over increasingly the things men have been accustomed to carry on as private, and therefore taxable, enterprise. Competitive considerations unite with the necessity for securing the federal revenue, in a time when the federal burden grows heavier proportionately than that of the states, to forbid that they be free to undermine rather than obligated to sustain the nation's financial requirements.

All agree that not all of the former immunity is gone. For the present I assent to the limitation against discrimination, which I take to mean that state functions

tax goods, income or services of each other." Speaking of the earlier Constitution, a commentator notes: "These limitations on the federal taxing power are all taken from our own jurisprudence, either by direct transcription from the Constitution of the United States or by the incorporation of principles laid down in decisions of our [the United States] supreme court, as is the case with the last-named prohibition"—"the prohibition against taxing the property, revenues, or services of the states." James, Federal Basis of the Brazilian System (1923) 45.

may not be singled out for taxation when others performing them are not taxed or for special burdens when they are. What would happen if the state should take over a monopoly of traditionally private, income-producing business may be left for the future, in so far as this has not been settled by *South Carolina* v. *United States,* 199 U. S. 437. Perhaps there are other limitations also, apart from the practical one imposed by the state's representation in Congress. If the way were open, I would add a further restricting factor, not of constitutional import, but of construction.

With the passing of the former broad immunity, I should think two considerations well might be taken to require that, before a federal tax can be applied to activities carried on directly by the states, the intention of Congress to tax them should be stated expressly and not drawn merely from general wording of the statute applicable ordinarily to private sources of revenue. One of these is simply a reflection of the old immunity, in the presence of which, of course, it would be inconceivable that general wording, such as the statute now in question contains, could be taken as intended to apply to the states.[1] The other is that, quite apart from reflections of that immunity, I should expect that Congress would say so explicitly, were its purpose actually to include state functions, where the legal incidence of the tax falls upon the state.[2] And the concurring opinion of Mr. Justice Bradley in *United States* v. *Railroad Co.,* 17 Wall. 322, 333, indicates that he may have been of this general view.

---

[1] To give removal of the immunity the effect of inverting the intention of Congress, in its later use of the same formula, is a leap in construction longer than seems reasonable to make.

[2] Cf. 26 U. S. C. § 22 (a) where Congress has specifically provided that compensation for personal service, includible in gross income, includes compensation for personal service as an officer or employee of a state, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing.

Nevertheless, since *South Carolina* v. *United States, supra,* such a rule of construction seems not to have been thought required.[3] Accordingly, although I gravely doubt that when Congress taxed every "person" it intended also to tax every state, the ruling has been made [4] and I therefore acquiesce in this case.

Mr. Chief Justice Stone concurring.

Mr. Justice Reed, Mr. Justice Murphy, Mr. Justice Burton and I concur in the result. We are of the opinion that the tax here involved should be sustained and the judgment below affirmed.

In view of our decisions in *South Carolina* v. *United States,* 199 U. S. 437; *Ohio* v. *Helvering,* 292 U. S. 360; *Helvering* v. *Powers,* 293 U. S. 214; and *Allen* v. *Regents,* 304 U. S. 439, we would find it difficult not to sustain the tax in this case, even though we regard as untenable the distinction between "governmental" and "proprietary" interests on which those cases rest to some extent. But we are not prepared to say that the national government may constitutionally lay a non-discriminatory tax on every class of property and activities of States and individuals alike.

Concededly a federal tax discriminating against a State would be an unconstitutional exertion of power over a co-existing sovereignty within the same framework of government. But our difficulty with the formula, now first suggested as offering a new solution for an old problem,

---

[3] *University of Illinois* v. *United States,* 289 U. S. 48; *Ohio* v. *Helvering,* 292 U. S. 360. See *Manhattan Co.* v. *Blake,* 148 U. S. 412. In *Graves* v. *N. Y. ex rel. O'Keefe,* 306 U. S. 466, 479, 480, the Court said, in another connection: "It is true that the silence of Congress, when it has authority to speak, may sometimes give rise to an implication as to the Congressional purpose. . . . But there is little scope for the application of that doctrine to the tax immunity of governmental instrumentalities."

[4] See *Ohio* v. *Helvering, supra.*

is that a federal tax which is not discriminatory as to the subject matter may nevertheless so affect the State, merely because it is a State that is being taxed, as to interfere unduly with the State's performance of its sovereign functions of government. The counterpart of such undue interference has been recognized since Marshall's day as the implied immunity of each of the dual sovereignties of our constitutional system from taxation by the other. *McCulloch* v. *Maryland,* 4 Wheat. 316. We add nothing to this formula by saying, in a new form of words, that a tax which Congress applies generally to the property and activities of private citizens may not be in some instances constitutionally extended to the States, merely because the States are included among those who pay taxes on a like subject of taxation.

If the phrase "non-discriminatory tax" is to be taken in its long accepted meaning as referring to a tax laid on a like subject matter, without regard to the personality of the taxpayer, whether a State, a corporation or a private individual, it is plain that there may be non-discriminatory taxes which, when laid on a State, would nevertheless impair the sovereign status of the State quite as much as a like tax imposed by a State on property or activities of the national government. *Mayo* v. *United States,* 319 U. S. 441, 447–448. This is not because the tax can be regarded as discriminatory but because a sovereign government is the taxpayer, and the tax, even though non-discriminatory, may be regarded as infringing its sovereignty.

A State may, like a private individual, own real property and receive income. But in view of our former decisions we could hardly say that a general non-discriminatory real estate tax (apportioned), or an income tax laid upon citizens and States alike could be constitutionally applied to the State's capitol, its State-house, its public school houses, public parks, or its revenues from taxes or

school lands, even though all real property and all income of the citizen is taxed. If it be said that private citizens do not own State-houses or public school buildings or receive tax revenues, it may equally be said that private citizens do not conduct a State-owned liquor business or derive revenue from a State-owned athletic field. Obviously Congress, in taxing property or income generally, is not taxing a State "as a State" because the State happens to own real estate or receive income. Whether a State or an individual is taxed, in each instance the taxable occasion is the same. The tax reaches the State because of the Congressional purpose to lay the tax on the subject matter chosen, regardless of who pays it. To say that the tax fails because the State happens to be the taxpayer is only to say that the State, to some extent undefined, is constitutionally immune from federal taxation. Only when and because the subject of taxation is State property or a State activity must we consider whether such a non-discriminatory tax unduly interferes with the performance of the State's functions of government. If it does, then the fact that the tax is non-discriminatory does not save it. If we are to treat as invalid, because discriminatory, a tax on "State activities and State-owned property that partake of uniqueness from the point of view of intergovernmental relations," it is plain that the invalidity is due wholly to the fact that it is a State which is being taxed so as unduly to infringe, in some manner, the performance of its functions as a government which the Constitution recognizes as sovereign.

It is enough for present purposes that the immunity of the State from federal taxation would, in this case, accomplish a withdrawal from the taxing power of the nation a subject of taxation of a nature which has been traditionally within that power from the beginning. Its exercise now, by a non-discriminatory tax, does not curtail the business of the state government more than it does the

like business of the citizen. It gives merely an accustomed and reasonable scope to the federal taxing power. Such a withdrawal from a non-discriminatory federal tax, and one which does not bear on the State any differently than on the citizen, is itself an impairment of the taxing power of the national government, and the activity taxed is such that its taxation does not unduly impair the State's functions of government. The nature of the tax immunity requires that it be so construed as to allow to each government reasonable scope for its taxing power, *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 524. The national taxing power would be unduly curtailed if the State, by extending its activities, could withdraw from it subjects of taxation traditionally within it. *Helvering* v. *Powers, supra,* 225; *Ohio* v. *Helvering, supra; South Carolina* v. *United States, supra,* and see *Murray* v. *Wilson Distilling Co.,* 213 U. S. 151, 173, explaining *South Carolina* v. *United States, supra.*

The problem is not one to be solved by a formula, but we may look to the structure of the Constitution as our guide to decision. "In a broad sense, the taxing power of either government, even when exercised in a manner admittedly necessary and proper, unavoidably has some effect upon the other. The burden of federal taxation necessarily sets an economic limit to the practical operation of the taxing power of the states, and *vice versa.* Taxation by either the state or the federal government affects in some measure the cost of operation of the other.

"But neither government may destroy the other nor curtail in any substantial manner the exercise of its powers. Hence the limitation upon the taxing power of each, so far as it affects the other, must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair

either the taxing power of the government imposing the tax . . . or the appropriate exercise of the functions of the government affected by it." *Metcalf & Eddy* v. *Mitchell, supra,* 523–524.

Since all taxes must be laid by general, that is, workable, rules, the effect of the immunity on the national taxing power is to be determined not quantitatively but by its operation and tendency in withdrawing taxable property or activities from the reach of federal taxation. Not the extent to which a particular State engages in the activity, but the nature and extent of the activity by whomsoever performed is the relevant consideration.

Regarded in this light we cannot say that the Constitution either requires immunity of the State's mineral water business from federal taxation, or denies to the federal government power to lay the tax.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

## I

If *South Carolina* v. *United States,* 199 U. S. 437, is to stand, the present judgment would have to be affirmed. For I agree that there is no essential difference between a federal tax on South Carolina's liquor business and a federal tax on New York's mineral water business. Whether *South Carolina* v. *United States* reaches the right result is another matter.

Mr. Justice Brandeis stated that "*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right." *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406. But throughout the history of the Court *stare decisis* has had only a limited application in the field of constitutional law. And it is a wise policy which largely restricts it to those areas of the law where correction can be had by legislation. Otherwise the Con-

stitution loses the flexibility necessary if it is to serve the needs of successive generations.

I do not believe *South Carolina* v. *United States* states the correct rule. A State's project is as much a legitimate governmental activity whether it is traditional, or akin to private enterprise, or conducted for profit. Cf. *Helvering* v. *Gerhardt,* 304 U. S. 405, 426–427. A State may deem it as essential to its economy that it own and operate a railroad, a mill, or an irrigation system as it does to own and operate bridges, street lights, or a sewage disposal plant. What might have been viewed in an earlier day as an improvident or even dangerous extension of state activities may today be deemed indispensable. But as Mr. Justice White said in his dissent in *South Carolina* v. *United States,* any activity in which a State engages within the limits of its police power is a legitimate governmental activity. Here a State is disposing of some of its natural resources. Tomorrow it may issue securities, sell power from its public power project, or manufacture fertilizer. Each is an exercise of its power of sovereignty. Must it pay the federal government for the privilege of exercising that inherent power? If the Constitution grants it immunity from a tax on the issuance of securities, on what grounds can it be forced to pay a tax when it sells power or disposes of other natural resources?

II

One view, just announced, purports to reject the distinction which *South Carolina* v. *United States* drew between those activities of a State which are and those which are not strictly governmental, usual, or traditional. But it is said that a federal tax on a State will be sustained so long as Congress "does not attempt to tax a State because it is a State." Yet if that means that a federal real estate tax of general application (apportioned) would be valid if applied to a power dam owned by a State but invalid if applied to a State-house, the old doctrine has merely been

poured into a new container. If, on the other hand, any federal tax on any state activity were sustained unless it discriminated against the State, then a constitutional rule would be fashioned which would undermine the sovereignty of the States as it has been understood throughout our history. Any such change should be accomplished only by constitutional amendment. The doctrine of state immunity is too intricately involved in projects which have been launched to be whittled down by judicial fiat.

## III

Woodrow Wilson stated the starting point for me when he said [1] that
"the States of course possess every power that government has ever anywhere exercised, except only those powers which their own constitutions or the Constitution of the United States explicitly or by plain inference withhold. They are the ordinary governments of the country; the federal government is its instrument only for particular purposes."
The Supremacy Clause, Article VI, clause 2, applies to federal laws within the powers delegated to Congress by the States. But it is antagonistic to the very implications of our federal system to say that the power of Congress to lay and collect taxes, Article I, § 8, includes the power to tax any state activity or function so long as the tax does not discriminate against the States.[2] As stated in *United States* v. *Railroad Co.*, 17 Wall. 322, 327–328,

---

[1] Constitutional Government in the United States (1908), pp. 183–184.

[2] As stated in *United States* v. *California*, 297 U. S. 175, 184, 185, the immunity of state instrumentalities from federal taxation "is implied from the nature of our federal system and the relationship within it of state and national governments, and is equally a restriction on taxation by either of the instrumentalities of the other." It went on to say in justification of making state activities subject to the exercise by Congress of the commerce power, "But there is no such limitation upon the plenary power to regulate commerce. The state can no more deny the power if its exercise has been authorized by Congress than can an individual."

"The right of the States to administer their own affairs through their legislative, executive, and judicial departments, in their own manner through their own agencies, is conceded by the uniform decisions of this court and by the practice of the Federal government from its organization. This carries with it an exemption of those agencies and instruments, from the taxing power of the Federal government. If they may be taxed lightly, they may be taxed heavily; if justly, oppressively. Their operation may be impeded and may be destroyed, if any interference is permitted."

Can it be that a general federal tax on the issuance of securities would be constitutional if applied to the issuance of municipal securities or of state bonds or of the securities of public utility districts organized by the States? Could the States be classified with farmers, business men, industrial workers, judges, and other ordinary citizens and required to pay an income tax to the federal government? It is said that a federal income tax on the tax revenues of a State would not be sustained because such a tax would interfere with a sovereign function of the State. But can it be that a federal income tax on state revenues derived not from taxes but from the sale of mineral water, liquor, lumber and the like, would be sustained?

A tax is a powerful, regulatory instrument. Local government in this free land does not exist for itself. The fact that local government may enter the domain of private enterprise and operate a project for profit does not put it in the class of private business enterprise for tax purposes. Local government exists to provide for the welfare of its people, not for a limited group of stockholders. If the federal government can place the local governments on its tax collector's list, their capacity to serve the needs of their citizens is at once hampered or curtailed. The field of federal excise taxation alone is practically without limits. Many state activities are in

marginal enterprises where private capital refuses to venture. Add to the cost of these projects a federal tax and the social program may be destroyed before it can be launched. In any case, the repercussions of such a fundamental change on the credit of the States and on their programs to take care of the needy and to build for the future would be considerable. To say the present tax will be sustained because it does not impair the State's functions of government is to conclude either that the sale by the State of its mineral water is not a function of government or that the present tax is so slight as to be no burden. The former obviously is not true. The latter overlooks the fact that the power to tax lightly is the power to tax severely. The power to tax is indeed one of the most effective forms of regulation. And no more powerful instrument for centralization of government could be devised. For with the federal government immune and the States subject to tax, the economic ability of the federal government to expand its activities at the expense of the States is at once apparent. That is the result whether the rule of *South Carolina* v. *United States* be perpetuated or a new rule of discrimination be adopted.

The notion that the sovereign position of the States must find its protection in the will of a transient majority of Congress is foreign to and a negation of our constitutional system. There will often be vital regional interests represented by no majority in Congress. The Constitution was designed to keep the balance between the States and the Nation outside the field of legislative controversy.

The immunity of the States from federal taxation is no less clear because it is implied. The States on entering the Union surrendered some of their sovereignty. It was further curtailed as various Amendments were adopted. But the Tenth Amendment provides that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the

States respectively, or to the people." The Constitution is a compact between sovereigns. The power of one sovereign to tax another is an innovation so startling as to require explicit authority if it is to be allowed. If the power of the federal government to tax the States is conceded, the reserved power of the States guaranteed by the Tenth Amendment does not give them the independence which they have always been assumed to have. They are relegated to a more servile status. They become subject to interference and control both in the functions which they exercise and the methods which they employ. They must pay the federal government for the privilege of exercising the powers of sovereignty guaranteed them by the Constitution,[3] whether, as here, they are disposing of their natural resources, or tomorrow they issue securities or perform any other acts within the scope of their police power.

Of course, the levying of the present tax does not curtail the business of the state government more than it does the like business of the citizen. But the same might be true in the case of many state activities which have long been assumed to be immune from federal taxation. When a municipality acquires a water system or an electric power plant and transmission facilities, it withdraws projects

---

[3] That fact distinguishes those cases where a citizen seeks tax immunity because his income was derived from a State or the federal government. Recognition of such a claim would create a "privileged class of taxpayers" (*Helvering* v. *Gerhardt, supra*, p. 416) and extend the tax immunity of the States or the federal government to private citizens. It was in protest to the recognition of such a derivative immunity that Mr. Justice Bradley dissented in *Collector* v. *Day*, 11 Wall. 113, 128, where the Court held unconstitutional a federal tax on the salary of a judicial officer of a State. As Mr. Justice Bradley stated, "No man ceases to be a citizen of the United States by being an officer under the State government." 11 Wall. p. 128. And see *Graves* v. *O'Keefe*, 306 U. S. 466, holding that salaries of federal employees may be constitutionally included in a non-discriminatory state income tax.

from the field of private enterprise. Is the tax immunity to be denied because a tax on the municipality would not curtail the municipality more than it would the prior private owner? Is the municipality to be taxed whenever it engages in an activity which once was in the field of private enterprise and therefore was once taxable? Every expansion of state activity since the adoption of the Constitution limits the reach of federal taxation if state immunity is recognized. Yet none would concede that the sovereign powers of the States were limited to those which they exercised in 1787. Nor can it be said that if the present tax is not sustained there will be withdrawn from the taxing power of the federal government a subject of taxation which has been traditionally within that power from the beginning. Not until *South Carolina* v. *United States* was it held that so-called business activities of a State were subject to federal taxation. That was after the turn of the present century. Thus the major objection to the suggested test is that it disregards the Tenth Amendment, places the sovereign States on the same plane as private citizens, and makes the sovereign States pay the federal government for the privilege of exercising the powers of sovereignty guaranteed them by the Constitution.

That this idea is hostile to the view of the Framers of the Constitution is evident from Hamilton's discussion of the taxing power of the federal government in The Federalist, Nos. 30–36 (Sesquicentennial Ed. 1937) pp. 183–224. He repeatedly stated that the taxing powers of the States and of the federal government were to be "concurrent"—"the only admissible substitute for an entire subordination, in respect to this branch of power, of the State authority to that of the Union." pp. 202–203. He also stated, "The convention thought the concurrent jurisdiction preferable to that subordination; and it is evident that it has at least the merit of reconciling an indefi-

nite constitutional power of taxation in the Federal government with an adequate and independent power in the States to provide for their own necessities." p. 209. On such assurances could it possibly be thought that the States were so subordinate that their activities could be taxed by the federal government?

In *M'Culloch* v. *Maryland*, 4 Wheat. 316, the Court held unconstitutional a state tax on notes of the Bank of the United States. The statement of Chief Justice Marshall (pp. 429–430) is adequate to sustain the case for the reciprocal immunity of the state and federal governments:

"If we measure the power of taxation residing in a State, by the extent of sovereignty which the people of a single State possess, and can confer on its government, we have an intelligible standard, applicable to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and property of a State unimpaired; which leaves to a State the command of all its resources, and which places beyond its reach, all those powers which are conferred by the people of the United States on the government of the Union, and all those means which are given for the purpose of carrying those powers into execution. We have a principle which is safe for the States, and safe for the Union. We are relieved, as we ought to be, from clashing sovereignty; from interfering powers; from a repugnancy between a right in one government to pull down what there is an acknowledged right in another to build up; from the incompatibility of a right in one government to destroy what there is a right in another to preserve. We are not driven to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power."

## IV

Those who agreed with *South Carolina* v. *United States* had the fear that an expanding program of state activity would dry up sources of federal revenues and thus cripple the national government. 199 U. S. pp. 454–455. That was in 1905.[4] That fear is expressed again today when we have the federal income tax, from which employees of the States may not claim exemption on constitutional grounds. *Helvering* v. *Gerhardt, supra.* The fear of depriving the national government of revenue if the tax immunity of the States is sustained has no more place in the present decision than the spectre of socialism, the fear of which, said Holmes, "was translated into doctrines that had no proper place in the Constitution or the common law." [5]

There is no showing whatsoever that an expanding field of state activity even faintly promises to cripple the federal government in its search for needed revenues. If the truth were known, I suspect it would show that the activity of the States in the fields of housing, public power and the like have increased the level of income of the people and have raised the standards of marginal or sub-marginal groups. Such conditions affect favorably, not adversely, the tax potential of the federal government.

---

[4] As the Solicitor General of New York points out, in the year when *South Carolina* v. *United States* was decided over one-fourth of the entire annual income of the federal government was derived from taxes on spirits and fermented liquors. See Annual Report, Secretary of the Treasury (1905), pp. 7, 26.

[5] Holmes, Collected Legal Papers (1921) p. 295.