In the Matter of State Insurance Fund, Appellant, against William E. Boyland et al., Constituting the Tax Commission of the City of New York, et al., Respondents.

First Department, October 27, 1953.

*Julian Jawitz* of counsel (*Bernard Katzen,* attorney), for appellant.

*James J. McGowan* of counsel (*Morris Handel* with him on the brief; *Denis M. Hurley, Corporation Counsel,* attorney), for respondents.

BOTEIN, J. In 1950 petitioner, the State Insurance Fund of the State of New York, purchased real estate in New York County for the purpose of erecting an office building for the transaction of its business. Shortly after the closing of title, formal and informal application was made to the respondents,

who constitute the Tax Commission of the City of New York, seeking removal of the property from the tax rolls. Petitioner asserted it was a State agency, and therefore exempt under the provisions of subdivision 2 of section 4 of the Tax Law.

After a hearing respondents notified petitioner that its application for exemption had been denied. Thereupon, petitioner brought this application under article 78 of the Civil Practice Act, to annul the respondents' denial of the application for exemption, to direct that such application be granted and to remove the real estate taxes imposed as a cloud upon the title.

The respondents' answer asserts affirmatively that petitioner is not a State agency but " merely a common insurance carrier competing with other private carriers for the business of workmen's compensation and so-called employees' health insurance ". The respondents enlarge on this theme in their first two affirmative defenses, alleging that petitioner is an independent entity exercising purely corporate and proprietary, as distinguished from governmental, functions.

A third defense, quoting article 13, sections 290-b and 290-c of the Tax Law, sections 165 and 166 of the New York City Charter, and section 166–1.0 of the Administrative Code of the City of New York, alleges in effect that they provide an adequate and exclusive statutory remedy for review of petitioner's claim for tax exemption; and that therefore relief under article 78 is not available to petitioner (Civ. Prac. Act, § 1285).

The fourth defense alleges that the proceeding under article 78 was not instituted within the period provided by statute.

Section 166–1.0 of the Administrative Code provides that the grounds upon which an application may be made to review or correct an assessment are that it is (1) illegal, (2) erroneous by reason of overvaluation, or (3) erroneous by reason of inequality. The petition was dismissed at Special Term on the ground that petitioner sought to nullify the assessment as illegal; that the procedure established by the Administrative Code and related statutes was an adequate and therefore exclusive mode of reviewing the Tax Commission's determination that the assessment was not illegal; and that therefore petitioner could not invoke article 78. It is from this order of dismissal that petitioner appeals.

We shall deal first with this procedural aspect of the case. We believe it must be resolved favorably to appellant because the " illegality " envisaged by the Administrative Code does

not encompass a genuine jurisdictional challenge to the very power of the respondents to assess at all. In *People ex rel. Erie R. R. Co.* v. *State Tax Comm.* (221 App. Div. 200), petitioner's certiorari proceeding was dismissed on the ground that the taxpayer had not appeared on grievance day and filed its objection, as required under section 45-a of the Tax Law. As in this case, the respondent Tax Commission construed the petitioner's challenge to its jurisdiction as a claim that under the statutory tax correction statutes the assessment was illegal; and it contended at Special Term that it was incumbent upon the aggrieved taxpayer to show that the application had been made in due time.

Special Term sustained the taxpayer's writ of certiorari (now art. 78) but the Appellate Division reversed. In turn reversing the Appellate Division, the Court of Appeals (246 N. Y. 322) virtually adopted the dissenting opinion of Mr. Justice DAVIS of the Appellate Division. He had said (p. 204): "The term 'illegality' as used in the statute is general. If it included an assessment that is void from its inception, then the petitioner here is remediless for it is conceded that it did not appear before the Commission and file any complaint on grievance day. I do not believe the term 'illegality' is so inclusive. If so, tax officials could assess property regardless of their jurisdiction, either as to territory or ownership. I think the term refers to the use of methods of assessment unauthorized by law. It implies fundamental jurisdiction but illegal means of exercising the power delegated."

The Court of Appeals, in the same case (246 N. Y. 322, 325-326) said: "this court has uniformly held for more than half a century the issue of jurisdiction can be raised at any time * * *. The jurisdiction of the Commission extends only to assessment of something which the law makes assessable. Whether the thing is assessable depends upon facts. * * * The Commission erroneously determined the existence of facts essential to its jurisdiction and, therefore, its acts in assessing property exempt from assessment were void" (cases cited).

Of similar purport is the holding in *People ex rel. Rendrock Powder Co.* v. *Feitner* (41 App. Div. 544).

But the dimensions of the word "illegality" as used in the tax statutes need not be labored. Petitioner seeks to review a determination of the basic jurisdictional issue as to whether this property is in fact taxable at all. And repeatedly and uniformly the courts have held that statutes purporting to set

up exclusive procedures for reviewing tax assessments do not bar collateral action when the taxes are levied without jurisdiction. "When a statute, as in this case, leaves to the assessing officers questions of a jurisdictional character it is well settled that their decision does not preclude parties aggrieved from resorting to judicial remedies. When their authority depends upon the existence of some fact, which they erroneously determine to exist, their acts pursuant to it are void." (*Elmhurst Fire Co.* v. *City of New York*, 213 N. Y. 87, 91.)

In *Dun & Bradstreet* v. *City of New York* (276 N. Y. 198, 206) the court said: "If taxing officers act without jurisdiction, their acts are illegal and void. In such a case, certiorari is not an adequate remedy even if a proper one." (Cases cited.)

Other cases staking the boundaries of so-called exclusive procedure statutes are: *Cooper Union* v. *City of New York* (272 App. Div. 438); *Matter of City of New York* (*Woodhaven Blvd.— Queens*), (260 App. Div. 659); *Dale* v. *City of New York* (71 App. Div. 227); *People ex rel. New York Central R. R. Co.* v. *State Tax Comm.* (292 N. Y. 130) and *People ex rel. Erie R. R. Co.* v. *State Tax Comm.* (221 App. Div. 200, *supra*).

We therefore clearly have the power in this proceeding to determine the basic question: Is the State Insurance Fund an agency of the State of New York whose property is exempt from taxation? Subdivision 2 of section 4 of the Tax Law provides that "Property of this state" shall be exempt from taxation. The word "state", used in this context, has been construed to include State agencies. In *Bush Term. Co.* v. *City of New York* (282 N. Y. 306, 318) it was settled that "property of a State or an agency of the State, held for a public purpose, is ordinarily not subject to a tax, and a tax imposed by a statute, though general in terms, will not be held to apply to such property." Such exemption attaches, of course, when the property of State or State agency is wholly dedicated to the use of the State. It also applies when, as will happen here, "as an incident of the execution of its public purpose the public agency derives revenue from a use of the property in competition with property put to similar use by private owners." (*Bush Term. Co.* v. *City of New York, supra*, p. 322.)

To determine whether it is in fact such a State agency, the purposes and functions of the fund must be considered in the light of its origin and development. In November, 1913, the

People of the State of New York adopted an amendment to the Constitution providing that for the protection of the lives, health and safety of the employees of the State, the Legislature could " either directly or through a state or other system of insurance or otherwise " provide for compensation for accidental injuries sustained by employees in certain employments or for death of employees resulting from such injuries (N. Y. Const., art. I, § 18). Subsequently, the Legislature adopted the Workmen's Compensation Law (L. 1914, ch. 41).

At this date there can be no disagreement with an early pronouncement of the Court of Appeals: "A compulsory scheme of insurance to secure injured workmen in hazardous employments and their dependents from becoming objects of charity certainly promotes the public welfare " (*Matter of Jensen* v. *Southern Pacific Co.*, 215 N. Y. 514, 526). Again it said: " The reasons for the enactment of the Workmen's Compensation Law and the humanitarian purpose which it was enacted to further have been stated by this court and the United States Supreme Court. It has been treated as an enlightened forward movement, based upon social experience, enacted to do away with the harsh and often unjust rule of the common law ". (*Phœnix Ind. Co.* v. *Staten Island R. T. Ry. Co.*, 251 N. Y. 127, 132.)

So there can be no doubt that the Workmen's Compensation Law was enacted in the public interest for the health, safety and welfare of the inhabitants of the State. And there can be no doubt that whatever constitutional method the Legislature adopted for the payment of workmen's compensation would be the nerve center of any system the Legislature established for administering the law.

Having made insurance the means of furnishing protection against the hazards of occupational injury, the Legislature was required to provide some medium whereby any employer could obtain such insurance. It was to supply this vital and necessary ingredient in the statutory scheme that the fund was created

Of course, the fact that the Workmen's Compensation Law blueprints the administration of an indubitable governmental function, and that the fund is a primary and essential actor in such administration, does not necessarily carry the fund inside the threshold of State sovereignty. The Legislature could have authorized an agreement with a private insurance carrier or with a pool of companies to accept all proffered policies; but such company or companies, while participating in the overall governmental enterprise, would not become tax exempt State

agencies through such participation. Conceivably, the Legislature could also have created some separate, autonomous entity, and invested it with the attributes of an independent contractor, so that it would never become endowed with the status claimed by the fund. It therefore becomes necessary to examine the beginnings and the structure of the fund to determine whether the Legislature intended to shelter it beneath the mantle of the State's sovereign immunities.

Section 76 of the Workmen's Compensation Law, several times amended, still provides that '' There is hereby continued in the department of labor a fund known as ' the state insurance fund ' ''. It is significant that while the 1914 law (L. 1914, ch. 14, § 90) provided that '' Such fund shall be administered by the commission [Workmen's Compensation Commission] without liability on the part of the state beyond the amount of such fund '', this restriction on liability was eliminated in 1922.

Section 77 of the law recites that the fund shall be administered by eight commissioners, consisting of the Industrial Commissioner of the State of New York and seven others appointed by the Governor of the State of New York with the advice and consent of the Senate; and section 78 makes provision for their compensation.

Section 85 provides that the funds of the State Insurance Fund shall be held by the Commissioner of Taxation and Finance and all disbursements therefrom shall be paid by him. It further states that he shall deposit such portion of said funds not needed for immediate use in the same manner and subject to all provisions of law respecting the deposit '' of other state funds by him ''.

Section 88 of the law requires submission of quarterly estimated budgets by the fund to the Director of Budget of the State of New York for his approval with the proviso that there may not be expended for administrative purposes more than the amounts therein specified in such budgets except as authorized by the Director of the Budget.

This section also provides that the Industrial Commissioner of the State of New York shall include in his annual report to the State Legislature a statement of the commissioners showing the expenses of administering the fund for the preceding year.

By section 88, it is provided that all appointments to positions in the State Insurance Fund shall be subject to civil service requirements.

Section 111 of the State Finance Law, which provides that no moneys of the State or agency of the State shall be paid,

expended or refunded except upon audit by the Comptroller, is made applicable to the fund in section 88.

The above-quoted and related provisions indicate that the Legislature intended to integrate the fund as a necessary and integral part of a carefully planned and developed structure for the administration of the Workmen's Compensation Law; and that it designedly lodged this entire structure in the State Department of Labor. We must conclude that the inextricable meshing of the fund into the basic administration of the Workmen's Compensation Law and its control and direction by the State, reflect a legislative intent to make the fund a State agency with the sovereign powers claimed by petitioner; and would appear to undermine respondents' contention that it is merely an independent public administrative entity.

Respondents, however, contend that the fund's activities and operation have a basically private enterprise character, and that its status is the same as that of any private insurance company. The major facet of this argument is that the fund is competing (with the competitive advantage of the claimed tax exemption) with private insurance companies (who are paying their fair share of taxation) for the business of underwriting insurance. (See *Matter of Torpedo Dress Corp.,* 176 Misc. 60, affd. on other grounds, 259 App. Div 994, affd. 285 N. Y. 626.) This argument might carry some validity were the fund, or for that matter the State, originally linked in a venture created for the purpose of conducting an insurance business in competition with then existing forms of insurance offered by private companies (cf. *Pantess* v. *Saratoga Springs Authority,* 255 App. Div. 426, 428, and *New York* v. *United States,* 326 U. S. 572). The legislative history, however, makes it clear that the fund's underwriting activities were not originated, and do not now exist, to compete with private carriers, but are a necessary means to achieve the governmental purpose of all-inclusive workmen's compensation insurance coverage.

Thus, the respondents' solicitude about the competition-harried insurance companies must be weighed in the light of the fact that those companies never did and of course could not underwrite workmen's compensation insurance until the Legislature carved out that form of insurance coverage in 1914. A present-day analogy would be legislation authorizing insurance carriers to insure employees against unemployment losses concurrently with the Unemployment Insurance Fund of the Labor Department. An examination of the fund's structure therefore indicates that its purposes, functions and operation are those

commonly related to a State agency. A consideration of the relevant cases leads to the same conclusion; and a further conviction that its property is tax exempt.

A number of decisions have held, in various contexts, that the fund is a State agency. Most recently, in *Cardinal* v. *State of New York* (304 N. Y. 400, 405), the Court of Appeals stated: "This suit, being on an insurance policy issued by the State Insurance Fund * * * was properly brought against the State itself, in the Court of Claims (see *Heath* v. *State of New York*, 303 N. Y. 658)." A similar holding was implicit in the cited *Heath* decision.

To the same effect are *Skakandy* v. *State of New York* (188 Misc. 214, affd. 274 App. Div. 153, affd. 298 N. Y. 886), in which the Appellate Division stated (p. 155): "The claim asserted is based on the alleged torts of the Commissioners of the State Insurance Fund in compromising the verdict. Such commissioners are officials and agents of the State * * * and as such may be sued only in the Court of Claims for their wrongful acts." (See, also, *Commissioners of State Ins. Fund* v. *Lapidus*, 182 Misc. 368; *Sadigur* v. *State of New York*, 173 Misc. 645.) This basic concept is not altered by a recent procedural change providing that the fund may sue or be sued as an entity "on all matters relating to ownership, management, operation and control of any such land and buildings or leaseholds", etc. (Workmen's Compensation Law, § 81). Such status is an administrative necessity in the operation of a large office building in which it is contemplated that space may be rented to private enterprise to a limited extent.

It might be argued that the fund may be deemed a State agency for the limited purpose of fixing the State's liability for the fund's tortious acts and contractual obligations; but that it does not follow that fund property is State property. But even if we isolate this narrow question, we reach the conclusion that fund moneys are State moneys. In *Matter of Cahill* v. *Tremaine* (269 N. Y. 573) the Court of Appeals held squarely that the moneys of the fund were "state moneys". This case involved a proceeding brought by an employee of the fund for restoration of a pay cut pursuant to section 1 of chapter 211 of the Laws of 1933 which provided for reduction in compensation to any person employed "by a state department, board, commission, body, officer, institution or other state agency and who is and shall be compensated from receipts of state moneys not paid into the state treasury".

Many of the arguments raised by respondents are contained in the dissenting opinion of the Appellate Division in *Matter of Cahill* v. *Tremaine* (245 App. Div. 773). No opinion was rendered by the Court of Appeals, but the printed report poses the issue as "whether the petitioner and persons ·similarly situated were paid from 'receipts of state moneys' within the meaning and reasonable intendment of the salary reduction statute."

Apparently realizing the force of these decisions, the respondents assert "a definite legislative intent to place the Fund on the same footing as other private insurance carriers, whatever its status may have been theretofore for other purposes". They cite subdivision 6 of section 187 of the Tax Law, as amended in 1949 (L. 1949, chs. 271, 600). This provides in substance that the fund shall pay franchise taxes, along with other insurance carriers, on certain categories of insurance premiums.

Instead of strengthening, this provision appears to weaken, the respondents' contention. Subdivision 6 of section 187 provides that the franchise tax is imposed "notwithstanding the provisions of subdivision eight" of this section. Subdivision 8, however, states that the section shall not apply to the Government of the United States, or of any State or municipality thereof, or any instrumentality of any such government. Implicit in this reservation would appear to be a tacit recognition of the fact that the fund was and still is a State "instrumentality".

Finally, the respondents rely on *Andrews* v. *City of New York* (254 App. Div. 168) which involved a motion to dismiss the city's answer as insufficient on the law in an action brought by the Industrial Commissioner to enjoin the city from levying taxes on a parcel of property acquired by the fund through foreclosure. The city contended that the parcel, leased commercially as a parking lot, was not entitled to exemption and that the fund was not in fact an agency of the State. This court did not pass upon the merits of these contentions, but merely held the city should be afforded the opportunity of developing its contentions upon a trial. Upon the comprehensive record submitted in this matter there are no questions presented which would require a trial. Furthermore, we are not confronted here with an investment or proprietary activity of the fund (except for the limited and incidental leasing of certain space) ; but we are concerned rather with a headquarters for administration of the fund.

Accordingly, the order of Special Term should be reversed, petitioner's motion to dismiss the third and fourth defense for legal insufficiency should be granted, and petitioner's application to annul respondents' denial of its application for exemption of its property from real estate taxation and for an order directing that its application for exemption be granted should be in all respects granted.

PECK, P. J., GLENNON, COHN and BREITEL, JJ., concur.

Order unanimously reversed and motion granted in accordance with the opinion herein. Settle order on notice.