COMMONWEALTH OF PENNSYL-
VANIA, Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

No. 73–2121.

United States Court of Appeals,
Third Circuit.

Argued April 1, 1974.

Decided June 28, 1974.

**248**

Barbara H. Brandon, and Karin Carter, Asst. Attys. Gen. of Pa., Harrisburg, Pa., for petitioner.

Wallace H. Johnson, Asst. Atty. Gen., and Edmund B. Clark, Martin Green, and Michael D. Graves, Attys., U. S. Dept. of Justice, Washington, D. C., for respondent.

Before VAN DUSEN, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This case is before this court on a petition of the Commonwealth of Pennsylvania to review the action of the Administrator of the Environmental Protection Agency ("EPA") in promulgating a transportation control plan for Pennsylvania, 40 C.F.R. Part 52, Subpart NN, 38 Fed.Reg. 32884 (November 28, 1971).[1] The issues presented are: (1) whether the Administrator erred in including in such plan a regulation requiring the Commonwealth to establish a program to ensure that by June 1, 1976, an air bleed to intake manifold retrofit will be installed on all pre-1968 light-duty motor vehicles in the Pennsylvania portion of the Metropolitan Philadelphia Interstate Air Quality Control Region and the Allegheny County portion of the Southwest Pennsylvania Intrastate Air Quality Control Region, 40 C.F.R. § 52.-

2039, 38 Fed.Reg. 32894 (November 28, 1973); and (2) whether the federal enforcement procedures set forth in § 113 of the Clean Air Act (the "Act"), 42 U.S.C. § 1857c–8, may be constitutionally applied to the Commonwealth if it fails to enforce the air bleed retrofit program, or any other provision of the implementation plan promulgated for Pennsylvania, 40 C.F.R. § 52.23, 38 Fed. Reg. 30633 (November 6, 1973).

Pursuant to the requirements of § 109 of the Act, 42 U.S.C. § 1857c–4, the Administrator promulgated, on April 30, 1971, national primary and secondary air quality standards for particular pollutants.[2] Under § 110 of the Act, 42 U.S.C. § 1857c–5, the states were required to submit a control strategy or implementation plan whereby the quantities of these prescribed air pollutants would be reduced to acceptable levels as defined by the primary and secondary standards.

Three of the pollutants for which states had to develop control strategies —carbon monoxide, hydrocarbons, and photo-chemical oxidants—are largely attributable to motor vehicles. As a consequence, Pennsylvania, as well as many other states, had to formulate a strategy capable of controlling emissions from mobile sources and could not rely on previous plans designed to control pollution from stationary sources. Because of the general lack of experience in this area, the Administrator, on May 31, 1972, permitted those states who could not rely on a stationary source approach to defer submission of their transportation control strategies for approximately one year beyond the statutory deadline, until February 15, 1973, and granted 21 states, including Pennsylvania, a two-year extension for the attainment date of the standards, until mid-1977, although their plans had not yet been sub-

---

1. Jurisdiction is based on § 307(b) of the Clean Air Act, 42 U.S.C. § 1857h–5(b).

2. The "primary" standards are those "requisite to protect the public health," while the "secondary" standards are those "requisite

to protect the public welfare." § 109(b) of the Act, 42 U.S.C. § 1857c–4(b). These standards state the maximum concentrations of pollutants in the ambient air which will be regarded as permissible, regardless of source.

mitted. 37 Fed.Reg. 10842. These actions by the Administrator were held to be beyond his authority under the Act in Natural Resources Defense Council v. Environmental Protection Agency, 154 U.S.App.D.C. 384, 475 F.2d 968 (1973). Thereafter, the Administrator notified the Commonwealth that its extensions were cancelled and that its implementation plan had to be submitted by April 15, 1973, and had to contain a strategy to meet the national ambient standards by mid-1975.

Pennsylvania was one of eight states to submit a control strategy by the April 15, 1973, deadline. On June 15, 1973, the Administrator approved the general strategies proposed by the Commonwealth but disapproved certain provisions of the plan dealing with the methods adopted for implementing the strategies. On July 3, 1973, pursuant to his authority under § 110(c)(2) of the Act, 42 U.S.C. § 1857c–5(c)(2), the Administrator proposed regulations to bring the Pennsylvania plan into compliance with the Act and to achieve further emission reductions in the Pittsburgh and Philadelphia areas. After public hearings on these proposals were held in Philadelphia and Pittsburgh, a transportation control plan was promulgated on November 28, 1973, for the Metropolitan Philadelphia and Southwest Pennsylvania Air Quality Control Regions, 40 C.F.R. Part 52, Subpart NN, 38 Fed.Reg. 32884.

In addition to the air bleed retrofit program, the Pennsylvania Transportation Control Plan requires the Commonwealth to establish an inspection system for certain motor vehicles to ensure that they do not emit carbon monoxide and hydrocarbons above the level prescribed by EPA, to set up bikeways in the Southwest Pennsylvania and Philadelphia Regions, to establish a computer carpool matching system for those Regions, to create exclusive bus and carpool lanes throughout Metropolitan Philadelphia and Pittsburgh, to limit public parking in the above-mentioned Regions, and to monitor carbon monoxide and hydrocarbon emissions to determine if the measures prescribed by EPA are effective. These parts of the plan were not challenged by the petition for review.

I.

An air bleed to intake manifold retrofit is basically a device designed to introduce excess air into the intake system of a motor vehicle; this results in a more complete burning of the fuel and thus reduces the amounts of hydrocarbons (unburned fuel) and carbon monoxide (burned fuel) emitted into the atmosphere. Under the transportation control plan promulgated by the Administrator, the Commonwealth must establish a program to ensure that all pre-1968 automobiles in the Metropolitan Philadelphia and Allegheny County Regions are equipped with an appropriate air bleed retrofit device. In particular, the Commonwealth is required to submit to the Administrator legally adopted regulations necessary to establish such a program, to cease registering or allowing to operate on its streets and highways vehicles which do not comply with the standards and procedures adopted pursuant to those regulations, and to submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce that program. 40 C.F.R. § 52.2039, 38 Fed. Reg. 32894.[3]

---

3. "§ 52.2039 Air bleed to intake manifold retrofit.

"(a) Definitions:

"(1) 'Air bleed to intake manifold retrofit' means a system or device (such as a modification to the engine's carburetor or positive crankcase ventilation system) that results in engine operation at an increased air-fuel ratio so as to achieve reductions in exhaust emissions of hydrocarbons and carbon monoxide from 1967 and earlier light-duty vehicles of at least 21 percent and 58 percent, respectively.

"(2) 'Light-duty vehicle' means a gasoline-powered motor vehicle rated at 6,000 lb GVW (gross vehicle weight) or less.

"(3) All other terms used in this section that are defined in Appendix N, to Part 51 of this Chapter, are used herein with the meanings so defined.

■ In Delaware Citizens for Clean Air, Inc. v. Administrator, U. S. Environmental Protection Agency, 480 F.2d 972, 976 (3d Cir. 1973), we held that the proper scope of review of the Administrator's approval of state implementation plans under § 110 of the Act, is that such action will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of 5 U.S.C. § 706(2)(A). Quoting from the Supreme Court's opinion in Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), we said:

> " 'To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [Citing authorities.] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. . The court is not empowered to substitute its judgment for that of the agency.' "

*Delaware Citizens for Clean Air, supra,* 480 F.2d at 976. Although the action challenged by petitioner here is not the approval of a state implementation plan but rather the promulgation of a federal plan to take the place of a rejected state plan, the latter action by the Administrator is also taken pursuant to his authority under § 110 of the Act and the same standard of review should apply.

"(b) This section is applicable in the Allegheny County portion of the Southwest Pennsylvania Intrastate AQCR and the Pennsylvania portion of the Metropolitan Philadelphia Interstate AQCR.

"(c) The Commonwealth of Pennsylvania shall establish a retrofit program to ensure that on or before June 1, 1976, all light-duty vehicles of model years prior to 1968, subject to registration in Pennsylvania and registered to persons residing in any area defined in paragraph (b) of this section, are equipped with an appropriate air bleed to intake manifold retrofit device. No later than April 1, 1974, the Commonwealth shall submit legally adopted regulations to the Administrator establishing such a program. The Commonwealth may exempt any class or category of vehicles that the Commonwealth finds is rarely used on public streets and highways (such as classic or antique vehicles). The regulation shall include:

"(1) Designation of an agency responsible for evaluating and approving such devices for use on vehicles subject to this section.

"(2) Designation of an agency responsible for ensuring that the provisions of paragraph (c)(3) of this section are enforced.

"(3) Provisions for beginning the installation of the air bleed devices by August 1, 1975, with installation of the devices on all vehicles subject to this section no later than May 31, 1976.

"(4) Procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and will have an adequate supply of retrofit components.

"(5) Criteria and procedures for identifying, whether by specially marked license plates, registration cards, or otherwise, vehicles subject to the requirements of this section.

"(d) After June 1, 1976, the Commonwealth shall not register or allow to operate on its streets or highways any light-duty vehicle subject to this section which does not comply with the applicable standards and procedures adopted pursuant to paragraph (c) of this section.

"(e) After June 1, 1976, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.

"(f) The Commonwealth of Pennsylvania shall submit to the Administrator no later than February 1, 1974, a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to paragraph (c) of this section, including:

"(1) The text of statutory proposals and regulations that the Commonwealth proposes for adoption.

"(2) The date by which the State will recommend needed legislation to the State legislature.

"(3) The date by which the Commonwealth will evaluate and approve devices for use in this program. Such date shall be no later than September 30, 1974.

"(g) The requirements of this section shall apply to any vehicle registered to any person residing outside any area defined in paragraph (b) of this section if said vehicle is used primarily within any such area."

■ The Commonwealth advances a number of arguments why the action of the Administrator in requiring the establishment of an air bleed retrofit program should be set aside. With regard to the application of that program to the Allegheny County portion of the Southwest Pennsylvania Intrastate Air Quality Region, the Commonwealth points out that in devising a strategy for that area, the Administrator relied on readings taken by the Allegheny County Air Pollution Bureau, which tended to over-estimate the amount of carbon monoxide in the ambient air.[4] EPA has conceded this error and has informally advised the Commonwealth that:

> "As a result of the deficiencies in the carbon monoxide air quality measurements for Pittsburgh, we have agreed that the data base is inadequate for determining and promulgating appropriate CO-oriented strategies . . . . Our initial judgment is that the CO-oriented air bleed retrofit (required by regulation, Section 52.-2039, 38 F.R. 32884) should be reevaluated and possibly substituted by an equivalent HC-oriented device, but that the remaining parts of the promulgation would be essentially the same." [5]

As a result, the Administrator does not contest the Commonwealth's argument that a revision of the transportation control plan for the Pittsburgh area may be necessary and has indicated in its brief that a reevaluation process will be initiated shortly.[6] However, the Administrator has yet to revoke § 52.2039 as it relates to Allegheny County or to announce formally a reconsideration of the carbon monoxide elements of the transportation strategy for that area. Since it is undisputed that there is presently no factual support for the establishment of an air bleed retrofit program in Allegheny County, that part of the Pennsylvania Transportation Control Plan requiring the Commonwealth to do so is arbitrary and capricious and must be set aside.

■ The Commonwealth sets forth several reasons why the application of the air bleed retrofit program to the Pennsylvania portion of the Metropolitan Philadelphia Interstate Air Quality Control Region should also be set aside. First, it argues that this program is not a "practicable" method for achieving the primary ambient standard for carbon monoxide in that area, as required of state implementation plans by the Act.[7]

---

4. In a letter dated December 31, 1973, from Ronald Chleboski, Director of the Allegheny County Bureau of Air Pollution Control, to Daniel Snyder, Regional Administrator for Region III of EPA (Record Document 107), Mr. Chleboski informed the Administrator that the 1971 carbon monoxide measurements were too high and discussed the methodological problems which caused this error. See also "Transportation Control Strategies for Pittsburgh," prepared by the School of Public and Urban Affairs at Carnegie-Mellon University (December 28, 1973).

5. See letter of January 24, 1974, from Robert C. Tussey, Jr., Deputy Director of the Air and Water Programs Division for Region III, to Clark Gaulding, Director of the Bureau of Air Quality and Noise Control, Department of Environmental Resources (Record Document 112).

6. The brief for the Administrator contains the following language on page 2, note 1:
  "Respondent does not contest petitioner's argument (Br. 7, 9–12) that revision of

the Control Plan for the Pittsburgh region may be necessary in light of new information indicating that measurement errors were made which led both the Commonwealth and the EPA to overestimate the amount of carbon monoxide in the ambient air of that city. A Notice of Proposed Rulemaking calling attention to the information on the alleged measurement errors and asking for public comments on possible plan revisions is being prepared by respondent and will be issued shortly. This notice will not constitute a commitment on the part of EPA to remove the air bleed retrofit device from the Pittsburgh plan, but will state that respondent will reexamine the strategy in light of revised information."

7. According to § 110(a)(2)(A)(i), state plans implementing a national primary ambient air standard must provide for the attainment of such standard "as expeditiously as practicable . . . ." The Act does not specifically establish legislative standards

In particular, the Commonwealth contends (1) that the Administrator incorrectly assumed, without any support from his own engineering data, that an air bleed retrofit device would achieve a 58% reduction per car in carbon monoxide emissions [8] and (2) that the Administrator failed to consider the economic and social impact and cost-effectiveness of an air bleed retrofit program for pre-1968 cars.[9] Furthermore, the Commonwealth argues that this matter should be remanded to the Administrator for further proceedings to determine whether an air bleed retrofit program is necessary in light of current petroleum allocation regulations. After a careful review of the record, we have concluded that the above-mentioned arguments of the Commonwealth are without merit and that the Administrator did not act in an arbitrary or capricious manner in requiring the establishment of an air bleed retrofit program to the Metropolitan Philadelphia area.

To begin with, the Administrator's determination that the use of an air bleed retrofit device on pre-1968 automobiles will result in a 58% reduction per car in carbon monoxide emissions is based on the study "Control Strategies for In-Use Vehicles." That study established the 58% reduction figure as the statistical mean of the reductions obtained from a test series involving 18 low-mileage tests of the air bleed retrofit device conducted upon pre-1968 tuned automobiles.[10]

(Record Doc. 26, table 3–3 and p. 3–24). We see no reason why the Administrator could not reasonably rely on the results obtained from these tests, since they reflect realistically the actual conditions under which pre-1968 automobiles are used in an urban setting.[11]

---

to guide the Administrator's action in filling a regulatory void left when a state plan is disapproved. The Commonwealth contends that after the Administrator has disapproved a state plan pursuant to § 110(c)(2), he must promulgate a plan in accordance with the statutory criteria contained in § 110(a)(2)(A)–(H) and the regulations contained in Requirements for the Preparation, Adoption and Submittal of Implementation Plans, 40 C.F.R. Part 51. Although we do not necessarily believe that the Administrator is bound by each and every criterion and regulation that is applicable to the states in devising an implementation plan, we agree that such standards should guide our determination of whether his action "was based on a consideration of the relevant factors." Citizens To Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. at 824. However, we wish to emphasize that while these statutory and administrative standards serve as guidelines for judicial review of the Administrator's implementation plan, their application to this situation in no way expands the scope of that review. See p. 250, supra.

8. The 58% reduction figure is cited in the regulation which establishes the air bleed retrofit program as part of the Pennsylvania Transportation Control Plan, 40 C.F.R. § 52.2039(a)(1), 38 Fed.Reg. 32894, quoted at note 3, supra.

9. The Administrator's guidelines to the states suggest consideration of the cost-effectiveness and the social and economic impact of the control strategy set forth in their implementation plans. 40 C.F.R. § 51.2(b) and (d). The relevance of those guidelines to a plan promulgated by the Administrator is discussed in note 7, supra.

10. The Commonwealth is incorrect in suggesting the basis for the Administrator's belief in the 58% reduction figure was a different test series designed to test the durability of the air bleed retrofit device and which produced carbon monoxide reduction figures far below 58%. The durability test was made upon one retrofitted vehicle which was driven for 25,000 miles, with measurements of its exhaust emissions taken every 5,000 miles (Record Doc. 26, p. 3–2), whereas measurements in the 18-test series were made after the vehicles had traversed only a short distance (Record Doc. 26, p. 3–19).

11. As the Administrator points out, urban driving tends to be for shorter distances, and pre-1968 automobiles are usually driven only about 6500 miles per year. Thus, the results of the low-mileage test series are clearly more indicative of actual driving conditions than those of the durability test series. The fact that the vehicles in the low-mileage test series were tuned prior to the test does not vitiate their results, since under the Pennsylvania Transportation Control Plan all automobiles will be inspected at least once a year and, if necessary, tuned to eliminate any emission control deficiency, 40 C.F.R. § 52.2038(d)(1) and (3), 38 Fed. Reg. 32894.

There is also ample evidence in the record to demonstrate that the Administrator gave adequate consideration to the social and economic impact and cost-effectiveness of an air bleed retrofit program. The Administrator recognized from the outset that the costs of such a program would fall heavily on the poor.[12]

However, its inclusion in the plan promulgated for the Commonwealth is justified by the fact that, according to the technical data available to EPA, the air bleed retrofit program is a practicable and efficient method for reducing carbon monoxide emissions in pre-1968 automobiles.[13] In particular, an EPA staff study entitled "The Clean Air Act and Transportation Controls: An EPA White Paper," indicates that if the date of implementation is 1977, an air bleed retrofit program for pre-1968 automobiles would be over six times as cost-effective as the next best technique in controlling carbon monoxide emissions on a region-wide basis (Record Doc. 33, p. 16). None of the other reports relied on by the Commonwealth casts any serious doubt on the cost-effectiveness of the air bleed retrofit program.[14] Although there is some question as to the exact aggregate reduction in carbon monoxide emissions that would be achieved by such a program, there is sufficient evidence that its contribution to the control of carbon monoxide emissions would be significant.[15] In sum, the record makes

12. In discussing the air bleed retrofit devices in the July 3, 1973, preamble to the proposed strategy, the Administrator stated:

"If a sizeable share of these costs [installation and maintenance] falls on individual automobile drivers, the burden will weigh more heavily on low-income families. The effect is exacerbated by the fact that older cars, subject to higher abatement equipment costs, tend to be owned by low-income families."

38 Fed.Reg. 17796. The device itself costs between $40.00 and $60.00 and annual maintenance costs between $5.00 and $15.00.

13. EPA limited this program to pre-1968 automobiles because light-duty vehicles sold nationally in the 1968 model-year and later already have emission controls which frequently either incorporated the air bleed retrofit approach or cannot function when such a device is added. 38 Fed.Reg. 15198 (June 8, 1973).

14. Although the inclusion of a retrofit strategy of any type was not recommended by "Transportation Control Strategies for the State Implementation Plan: City of Philadelphia," EPA Report APTD–1370 (February 1973) (Record Doc. 70, p. 5), that study noted that the air bleed device "appears to be the most cost effective" of the available retrofit devices (Ibid., p. 35). Similarly, the contractor's report on the Pittsburgh transportation control strategies, "Transportation Controls to Reduce Motor Vehicle Emissions in Pittsburgh, Pennsylvania," EPA Report APTD–1446 (December 1972) (Record Doc. 77), gave retrofit devices in general a rating of four (on an ascending scale from one to five) as to technical effectiveness (Ibid., Table III–1, p. III–9), and the low rating of two as to economic impact merely indicated that retrofit devices were found to be "[n]ot cost effective on [any] basis other than emissions reduction" (Ibid., Table III–3, p. III–39). Finally, the Carnegie-Mellon study, "Transportation Control Strategies for Pittsburgh," which was not available to the Administrator before the promulgation of the Pennsylvania Transportation Control Plan, ranked the cost-effectiveness in reducing carbon monoxide emissions of an air bleed retrofit device on pre-1968 cars second only to the same device on 1968–71 cars; however, for the reasons cited in note 13, supra, the latter was not a practicable alternative.

15. In the preamble to the Pennsylvania Transportation Control Plan, 38 Fed.Reg. 32887, EPA predicts that if implemented by May 31, 1976, the air bleed retrofit program would reduce carbon monoxide emissions in the Metropolitan Philadelphia area by 1386 tons, or 4.8% per year. This figure is somewhat lower than the 7.1% reduction estimated in the original EPA White Paper (Record Doc. 33, p. 16). However, it accords with the EPA study of the transportation control strategies which found that the total carbon monoxide emission reductions that could be expected from the use of retrofit devices were 860 tons per year in the Philadelphia Central Business District (Record Doc. 70, p. 36). The only report cited by the Commonwealth that challenged the EPA estimate was "Evaluating Transportation Controls to Reduce Motor Vehicle Emissions in Major Metropolitan Areas," EPA Report APTD–1363 (November 1972) (Record Doc. 23). That study concluded that a retrofit strategy for pre-1968 vehicles would achieve an aggregate reduction in monoxide emissions of 5.2% in 1975 and 3.-

clear that the Administrator's decision to include the air bleed retrofit program in the control plan for the Metropolitan Philadelphia area "was based on a consideration of the relevant factors" and we are not persuaded by the arguments and data adduced by the Commonwealth that "there has been a clear error of judgment." Citizens To Preserve Overton Park, Inc. v. Volpe, *supra*, 401 U.S. at 416, 91 S.Ct. at 824 as quoted at page 250 above.

■ Finally, we do not believe that the current petroleum allocation regulations, 10 C.F.R. § 211 et seq., 39 Fed.Reg.1933 (January 15, 1974), necessitate that the Pennsylvania Transportation Control Plan be remanded to the Administrator for further consideration. It may be, as the Commonwealth contends, that these regulations will substantially reduce carbon monoxide emissions in the Philadelphia area by restricting purchases of fuel and thus decreasing the number of vehicle miles travelled. However, as the Commonwealth acknowledges, "the length of time the current gasoline shortage will require the enforcement of a wholesale allocation scheme remains a matter of doubt" (brief, p. 25). In fact, the law under which the allocations are made is due to expire on February 28, 1975 (§ 4(g)(1), Emergency Petroleum Allocation Act of 1973, Pub.L. No. 93–159). The Pennsylvania Transportation Control Plan, on the other hand, does not call for achieving the air quality standards in Philadelphia until May 31, 1976. Thus, while the persistence of the gasoline shortage until 1976 might then make the revision of the plan advisable, the situation is too uncertain at this time to justify a remand by this court.

## II.

The transportation control plan originally proposed by the Administrator for Pennsylvania, like that proposed for other states, contained provisions regarding violations and enforceability of the substantive regulations contained therein. See proposed 40 C.F.R. §§ 52.-2037(g), 52.2038(c), 52.2039(b)(8), 52.-2040(e), and 52.2042(f), 38 Fed.Reg. 17797–99 (July 3, 1973). For reasons of administrative convenience, and with no intent to change their meaning or effect, these provisions were deleted from the final regulations promulgated for each state and were replaced by a general regulation on these matters which is applicable to all regulations promulgated by the Administrator as part of the transportation control plan for those states whose own implementation plan has been found inadequate. 38 Fed.Reg. 30633 (November 6, 1973). That regulation, 40 C.F.R. § 52.23, reads as follows:

" § 52.23 Violation and enforcement.

"Failure to comply with any provisions of this part shall render the person or Governmental entity so failing to comply in violation of a requirement of an applicable implementation plan and subject to enforcement action under Section 113 of the Clean Air Act. With regard to compliance schedules, a person or Governmental entity will be considered to have failed to comply with the requirements of this part if it fails to timely submit any required compliance schedule, if the compliance schedule when submitted does not contain each of the elements it is required to contain, or if

---

2% in 1977—the decrease due to the fact that as time passes pre-1968 vehicles account for a declining share of the vehicle miles traveled. The report added that even these figures might over-estimate the impact of a retrofit strategy because of the inevitable deterioration of the retrofit devices and the possible lack of governmental cooperation on the state level. These conclusions, however, are not compelling. The report did not analyze the various kinds of retrofit devices separately and is thus not specific enough to be relied on. Furthermore, the problem of the deterioration of the devices can be overcome by periodic inspection and maintenance, and intergovernmental cooperation is ensured by §§ 110(a)(2)(E) and 113 of the Act.

the person or Governmental entity fails to comply with such schedule."

Under § 113(a) & (b) of the Act,[16] the Administrator may at the appropriate time enforce any requirement of an applicable implementation plan by issuing an order to comply or by bringing a civil action against any person in violation of

16. "Sec. 113. (a)(1) Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any requirement of an applicable implementation plan, the Administrator shall notify the person in violation of the plan and the State in which the plan applies of such finding. If such violation extends beyond the 30th day after the date of the Administrator's notification, the Administrator may issue an order requiring such person to comply with the requirements of such plan or he may bring a civil action in accordance with subsection (b).

"(2) Whenever, on the basis of information available to him, the Administrator finds that violations of an applicable implementation plan are so widespread that such violations appear to result from a failure of the State in which the plan applies to enforce the plan effectively, he shall so notify the State. If the Administrator finds such failure extends beyond the 30th day after such notice, he shall give public notice of such finding. During the period beginning with such public notice and ending when such State satisfies the Administrator that it will enforce such plan (hereafter referred to in this section as 'period of federally assumed enforcement'), the Administrator may enforce any requirement of such plan with respect to any person—

"(A) by issuing an order to comply with such requirement, or

"(B) by bringing a civil action under subsection (b).

"(3) Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of section 111(e) (relating to new source performance standards) or 112(c) (relating to standards for hazardous emissions), or is in violation of any requirement of section 114 (relating to inspections, etc.), he may issue an order requiring such person to comply with such section or requirement, or he may bring a civil action in accordance with subsection (b).

"(4) An order issued under this subsection (other than an order relating to a violation of section 112) shall not take effect until the person to whom it is issued has had an opportunity to confer with the Administrator concerning the alleged violation. A copy of any order issued under this subsection shall be sent to the State air pollution control agency of any State in which the violation occurs. Any order issued under this subsection shall state with reasonable specificity the nature of the violation, specify a time for compliance which the Administrator determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In any case in which an order under this subsection (or notice to a violator under paragraph (1)) is issued to a corporation, a copy of such order (or notice) shall be issued to appropriate corporate officers.

"(b) The Administrator may commence a civil action for appropriate relief, including a permanent or temporary injunction, whenever any person

"(1) violates or fails or refuses to comply with any order issued under subsection (a); or

"(2) violates any requirement of an applicable implementation plan (A) during any period of Federally assumed enforcement, or (B) more than 30 days after having been notified by the Administrator under subsection (a)(1) of a finding that such person is violating such requirement; or

"(3) violates section 111(e) or 112(c); or

"(4) fails or refuses to comply with any requirement of section 114.

"Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such action shall be given to the appropriate State air pollution control agency.

"(c)(1) Any person who knowingly—

"(A) violates any requirement of an applicable implementation plan (i) during any period of Federally assumed enforcement, (ii) more than 30 days after having been notified by the Administrator under subsection (a)(1) that such person is violating such requirement, or

"(B) violates or fails or refuses to comply with any order issued by the Administrator under subsection (a), or

"(C) violates section 111(e) or section 112(c), shall be punished by a fine of not more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both. If the conviction is for

such requirement. In addition, under § 113(c) any person who knowingly violates any requirement of an applicable implementation plan or violates or fails or refuses to comply with an order issued by the Administrator is subject to criminal sanctions.

In its petition the Commonwealth challenges the constitutionality of the Administrator's action in making the enforcement procedures of § 113 of the Act applicable to the Commonwealth for any failure by it to implement the provisions of the Pennsylvania Transportation Control Plan, arguing that such action exceeds the federal commerce power. The implications of this argument, however, extend far beyond the question of the validity of a single regulation. The power of the Administrator to apply the federal enforcement procedures to the Commonwealth as contemplated in 40 C.F.R. § 52.23 depends on the constitutionality of the substantive regulations to be enforced. See Employees of the Department of Public Health and Welfare v. Department of Public Health and Welfare, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973); Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968); Parden v. Terminal Ry. of the Alabama State Docks Department, 377 U.S. 184, 190–192, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Furthermore, the effectiveness of state implementation of those regulations depends as a practical matter on the availability of federal enforcement for noncompliance by the states. Thus, while the primary focus of the Common-

wealth's attack is the threatened use against it of the sanctions authorized by § 113 of the Act, the underlying issue is the power of the Federal Government to require a state to enforce an implementation plan. Although in its challenge to the substantive portion of the Pennsylvania Transportation Control Plan, see Part I, *supra*, the Commonwealth purports to object only to the air bleed retrofit program, the effect of its constitutional argument is to question its obligation to implement any provision of that plan.[17]

In view of the policy of federal courts to avoid passing upon a constitutional question if a case can be decided on statutory grounds, see Rescue Army v. Municipal Court, 331 U.S. 549, 568–569, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), we shall consider first whether Congress intended, when it passed the Clean Air Amendments of 1970, to require the states to enforce applicable implementation plans and to subject them to federal sanctions if they failed to meet this obligation. After resolving this issue, we shall turn to the constitutional question presented by the Commonwealth.

*A.*

The language of the Act demonstrates that, in at least some cases, Congress was willing to subject states to implementation plan requirements and to federal enforcement of them. Section 113 provides that enforcement actions may

---

a violation committed after the first conviction of such person under this paragraph, punishment shall be by a fine of not more than $50,000 per day of violation, or by imprisonment for not more than two years, or by both.

"(2) Any person who knowingly makes any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this Act or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this Act, shall upon conviction, be pun-

ished by a fine of not more than $10,000, or by imprisonment for not more than six months, or by both."

17. In view of this interrelation between the enforcement procedures and the substantive regulations contained in the implementation plan, the Commonwealth's constitutional challenge to 40 C.F.R. § 52.23 is clearly ripe for adjudication. See § 307(b)(1) and (2) of the Act, 42 U.S.C. § 1857h–5(b)(1) & (2), and Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

be taken against "any person," a term defined in § 302(e), 42 U.S.C. § 1857h(e), to include any "State, municipality, and political subdivision of a State." Section 113 also provides that such action may be taken when there has been a violation of "any requirement" of an applicable implementation plan. The only question, then, as to the statutory authority for the Administrator's actions in this case is whether Congress contemplated that an implementation plan might require a state to enforce the substantive transportation control provisions of such plan. We have concluded that Congress did contemplate that possibility and that, therefore, the Administrator is authorized to require the Commonwealth to enforce its transportation control plan.

There can be little doubt that Congress intended sweeping changes to be made in transportation and land-use policies where that was necessary to achieve national air quality standards.[18] In this case the Administrator has determined that to reduce vehicle emissions and attain such standards, the Philadelphia and Pittsburgh Regions need an inspection and maintenance system, an air bleed retrofit program, bikeways, carpools, busways, and on-street parking restrictions. See page 249, *supra*. There are only two ways in which the Administrator could ensure that these strategies would be implemented: by applying the resources of the Federal Government to implementing them or by requiring the Commonwealth to do so. For reasons set forth in detail in the general preamble to all the transportation control plans, the Administrator felt that direct federal enforcement was not the means contemplated by the Act. 38 Fed.Reg. 30632–33 (November 6, 1973). Such a determination by the responsible agency is, of course, entitled to "great deference," Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), particularly since it represents the judgment of one charged with carrying out the statutory provisions "while they are yet untried and new," Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933).

One of the principal reasons why the Administrator rejected. federal implementation of transportation control strategies was that such an approach was inefficient and impractical. It would require the Federal Government to set aside bus lanes and thereby take detailed responsibility for the regulation of roads and highways which, at present, are patrolled and maintained by

---

18. Section 110(a)(2)(B) of the Act provides that each state plan implementing a national primary or secondary air quality standard shall contain "emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including but not limited to, land-use and transportation controls." The Senate version of the Clean Air Amendments of 1970 contained language almost identical in substance to the "transportation control" provision quoted above. The committee report said of it: "The Committee recognizes that during the next several years, the attainment of required ambient air quality in many of the metropolitan regions of this country will be impossible if the control of pollution from moving sources depends solely on emission controls. The Committee does not intend that these areas be exempt from meeting the standards. Some regions may have to establish new transportation programs and systems combined with traffic control restrictions in order to achieve ambient air quality standards for pollution agents associated with moving sources." S.Rep.No. 91–1196, 91st Cong., 2d Sess. 13 (September 17, 1970). Similar statements were made concerning the language of the conference report that was eventually enacted into law:

"Those [ambient air quality] standards, realistically applied, will require that urban areas do something about their transportation systems, the movement of used cars, the development of public transit systems, and the modification and change of housing patterns, employment patterns, and transportation patterns generally. All of that is implicit in the concept of implementation plans for national ambient air quality standards and what they mean for the used cars in our country." 116 Cong.Rec. 42386–87 (December 18, 1970) (Sen. Muskie).

state agencies. Similarly, it would require the establishment of federally staffed and operated inspection and maintenance and retrofit programs for vehicles which, at present, are registered, inspected, and regulated almost exclusively at the state and local level. Thus, the Administrator concluded: "It is clearly necessary that implementation of transportation control plans be carried out at the State and local level." 38 Fed.Reg. 30633. It is well established that a court may not "in the absence of compelling evidence that such was Congress' intention . . . prohibit administrative action imperative for the achievement of an agency's ultimate purposes." Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 653, 93 S.Ct. 2488, 2494, 37 L.Ed.2d 235 (1973), quoting Permian Basin Area Rate Cases, 390 U.S. 747, 780, 88 S.Ct. 1344, 20 L. Ed.2d 312 (1968). The legislative history of the Clean Air Amendments of 1970, far from demonstrating such a prohibition, shows a clear expectation that the states would have to implement significant portions of their transportation control plans and indicates an underlying assumption that they could be required to do so.

Section 110(a)(2)(G) of the Act requires each state implementation plan to provide "to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with the applicable emission standards." Since states are to promulgate such plans, the natural inference to be drawn from this language is that Congress intended for each state to provide for inspection and maintenance of automobiles registered within it. This conclusion is supported by the legislative history of the Act. The House Report on the bill said:

"[T]he legislation provides that *States must require* inspection of motor vehicles in actual use if the . . . [Administrator], after consultation with the State, determines that the achievement of ambient air quality standards requires such inspection and that such inspection is technologically and economically feasible."

H.Rep. No. 91–1146, 91st Cong., 2d Sess. 3–4 (June 3, 1970) (emphasis added). The Senate Report is to the same effect:

"The implementation plan section of the proposed bill would specifically provide that, to the extent necessary, *each region develop* motor vehicle inspection and testing programs for which it is eligible to receive assistance under Section 208 [now 210] of the proposed bill. The Committee believes that this is an extremely important provision . . . . It is also a class of air pollution sources for which the regions and the States have better opportunities to control."

S.Rep. No. 91–1196, 91st Cong., 2d Sess. 13 (September 17, 1970) (emphasis added).

■ In view of Congress' willingness to require states, where necessary, to establish and operate a periodic inspection of all state-registered automobiles, it seems unlikely that it would have had any objection to requiring states to carry out other programs to reduce pollution from in-use vehicles. Indeed, the legislative history is replete with indications that Congress contemplated just such an approach. Congressman Staggers, the floor manager of the bill on the House side, put the matter most forcefully:

"If we left it all to the Federal Government, we would have about everybody on the payroll of the United States. We know this is not practical. Therefore, the Federal Government sets the standards, we tell the States what they must do and what standards they must meet. These standards must be put into effect by the communities and the states, and we expect them to have the means to do the actual enforcing."

116 Cong.Rec. 19204 (June 10, 1970). Almost every other reference to the implementation and enforcement of transportation controls in the legislative his-

tory reflects the same view.[19] In sum, Congress clearly contemplated that states could be required to implement a transportation control plan, and thus the Administrator's action in promulgating regulations containing such a requirement for the Commonwealth and applying federal enforcement procedures to it was within his statutory authority.

## B.

The Commonwealth does not dispute that air pollution has an effect upon commerce and hence can be validly regulated by Congress. United States v. Bishop Processing Co., 287 F.Supp. 624, 630–632 (D.Md.1968), aff'd, 423 F.2d 469 (4th Cir.), cert. denied, 398 U.S. 904, 90 S.Ct. 1695, 26 L.Ed.2d 63 (1970). See Katzenbach v. McClung, 379 U.S. 294, 303–304, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 253–259, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Thus, the Federal Government clearly has the power to direct individual vehicle owners to equip their automobiles with emission control devices and to observe federal traffic and parking controls designed to reduce air pollution.[20] Furthermore, it is well established that

> "while the commerce power has limits, valid regulations of commerce do not cease to be regulations of commerce because a State is involved. If a State

is engaging in economic activities that are validly regulated by the Federal Government when engaged in by private persons, the State too may be forced to conform its activities to federal regulation."

Maryland v. Wirtz, *supra,* 392 U.S. at 197, 88 S.Ct. at 2024. See also United States v. California, 297 U.S. 175, 183–185, 56 S. Ct. 421, 80 L.Ed. 567 (1936). The Commonwealth argues, however, that in proposing and enforcing transportation control plans under the Clean Air Act, a state is not engaging in activity also engaged in by private persons, but rather is exercising uniquely governmental functions and thus, by requiring the Commonwealth to implement the programs mandated by the transportation control plan, the Administrator has exceeded the limits of the federal commerce power and has unconstitutionally infringed upon the state's sovereignty.

Our consideration of this argument must begin with an analysis of Maryland v. Wirtz, *supra,* where a similar claim was made and rejected. In that case the Supreme Court decided that Congress' power under the Commerce Clause provides a constitutional basis for extending the Fair Labor Standards Act to state-operated schools and hospitals. Although the Court noted that under the facts of the case, there did not appear to be an interference with "sovereign state functions," [21] it stated that

> "Since the decision in McCulloch v. Maryland, 4 Wheat. 316, 420, 4 L.Ed. 579, it has seldom if ever been doubted that Congress has power in order to attain a legitimate end—that is, to accomplish the full purpose of a granted authority—to use all appropriate means plainly adapted to that end, unless inconsistent with other parts of the Constitution. And we have said, that the Tenth Amendment 'does not operate as a limitation upon the powers, express or implied, delegated to the national government.'" (footnote omitted)

Case v. Bowles, 327 U.S. 92, 102, 66 S.Ct. 438, 443, 90 L.Ed. 552 (1946).

19. See, *e. g.,* S.Rep.No. 91–1196, 91st Cong., 2d Sess. 14 (September 17, 1970) ("The States would be expected to act to improve used vehicle performance"); 116 Cong.Rec. 32903 (September 21, 1970) (Sen. Muskie) ("In Title I of this act we have written a national deadline for the purpose of implementing applicable ambient air quality standards. This is going to require every State Governor and the mayor of every city in this country to impose strict controls on the use of automobiles before the new car is a clean one.").

20. The constitutionality of such federal regulations would not seem to be subject to attack on the ground that they interfere with the powers reserved to the states, for the Supreme Court has stated:

21. "The Act establishes only a minimum wage and a maximum limit of hours unless overtime wages are paid, and does not

in any case it is inappropriate to pose the issue in this way, since any exercise by the Federal Government of its delegated powers will necessarily "interfere" with the power of the states. *Ibid.* 392 U.S. at 195–196, 88 S.Ct. 2017. Rather, the Court framed the question simply as whether a particular statute is a valid regulation of commerce, and it went on to hold that the fact that the activity in question was carried on by a state, rather than a private person, did not affect the federal commerce power to regulate it.

The Commonwealth argues that this decision is limited to the situation where the state is engaging in activities also engaged in by private enterprises. Similarly, it contends that United States v. California, *supra,* should be interpreted narrowly, as holding only that a state-owned railroad, operated as a non-profit venture for the purpose of facilitating transportation at a port, was subject, *like other railroads,* to the Safety Appliance Act. However, a careful reading of the opinion in Maryland v. Wirtz, *supra,* reveals that the Court did not intend that the scope of the federal commerce power over state activities should depend on whether such activities were also carried on by private enterprises, but only that the resolution of this constitutional issue should *not* depend on whether the party to be regulated is a private person or a state.

The Court began its analysis by reaffirming that the power to regulate commerce is limited to activities that affect interstate or foreign commerce and by cautioning that Congress may not use a relatively trivial impact on commerce as an excuse for broad, general regulation of state or private activities. Maryland v. Wirtz, *supra,* 392 U.S. at 196–197, and

n.27, 88 S.Ct. 2017. It therefore felt that "[t]he Court has ample power to prevent what the appellants purport to fear, 'the utter destruction of the State as a sovereign political entity.'" *Ibid.* at 196, 88 S.Ct. at 2024. The Court then proceeded to quote with approval the following language from United States v. California:

"'[W]e think it unimportant to say whether the state conducts its railroad in its "sovereign" or in its "private" capacity. That in operating its railroad it is acting within a power reserved to the states cannot be doubted. The only question we need consider is whether the exercise of that power, in whatever capacity, must be in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government. The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution.

.   .   .   .   .   .

"'[W]e look to the activities in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. But there is no such limitation upon the plenary power to regulate commerce. The state can no more deny the power if its exercise has been authorized by Congress than can an individual.' 297 U.S., at 183–185, 56 S.Ct. at 424 (citations omitted)." *Ibid.* at 197–198, 88 S.Ct. at 2024–2025. Finally, the Court concluded its discussion by stating that "it will not carve up the commerce power to protect enterprises *indistinguishable in their effect on commerce* from private businesses, simply because those enterprises happen

---

otherwise affect the way in which school and hospital duties are performed. Thus appellants' characterization of the question in this case as whether Congress may, under the guise of the commerce power, tell the States how to perform medical and educational functions is not factually accurate. Congress has 'interfered with' these state functions only to the extent of providing that when a State employs people in performing such functions it is subject to the same restrictions as a wide range of other employers whose activities affect commerce, including privately operated schools and hospitals."

Maryland v. Wirtz, *supra,* 392 U.S. at 193–194, 88 S.Ct. at 2022.

to be run by the States for the benefit of their citizens." *Ibid.* at 198–199, 88 S.Ct. at 2025 (emphasis added).

■ This reasoning indicates that the basis for the Court's decision in Maryland v. Wirtz, *supra,* is the principle that the constitutionality of federal regulation of state activities is subject to the same analysis as that of private activities; *viz.* the determinative factor is simply whether they have an impact on interstate commerce. Following this principle, we believe that the Administrator acted within the federal commerce power in requiring the Commonwealth to enforce its transportation plan. As the Administrator has pointed out, 38 Fed.Reg. 30632:

"Transportation is a necessary service. In our society, the form in which it is provided depends overwhelmingly on the regulatory, taxing, and investment decisions made at all levels of government. By building and maintaining roads and highways, by licensing vehicles and operators, by providing a system of traffic laws, and in many other ways, government has encouraged the growth of automobile use to its present levels. There is nothing inevitable about such a choice. Governments could equally well have chosen to discharge their basic function of maintaining a transportation system in ways that would have discouraged the use of single-passenger automobiles, and encouraged the use of mass transit. But often they have not.

"The production of food, electricity, and other consumer and industrial goods is as necessary in our society as transportation. In each case, the Clean Air Act authorizes regulations requiring such an activity, whether State or private, to be undertaken in the least polluting way in order to attain and maintain the air quality standards. There is no valid distinction between such production facilities and the State-owned automotive transportation facilities. In a comparable situation, the Supreme Court has held that State-owned rail transportation facilities must comply with Federal safety regulations."

The fact that for historical reasons automotive transportation systems, unlike railways,[22] are not operated by private enterprises but only by state and local governments is irrelevant. The states have, by their transportation policies, contributed to the problem of air pollution from automobile emissions, and they can be required to take affirmative actions to correct it. The Commonwealth cannot, by denominating traffic control and vehicle registration as "governmental" activities, immunize them from federal regulation designed to reduce air pollution.

The Commonwealth contends, nevertheless, that the transportation control plan promulgated by the Administrator unconstitutionally interferes with the performance of its governmental functions because it requires the Commonwealth in effect to enforce a federal regulation. In support of this contention, the Commonwealth cites New York v. United States, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946), a case involving the limits upon the federal taxing power. However, we do not believe that the somewhat conflicting principles stated there in the plurality opinions[23] are

22. Perhaps the closest analogy to the situation in this case would be a state-owned railway system, created and maintained for use by private railroad companies. We have little doubt that the Federal Government could regulate such a system by requiring the state to operate it in such a way as to deal with a problem, like safety or air pollution, which affects interstate commerce. *Cf.* United States v. California, *supra.*

23. Speaking for two members of the Court, Justice Frankfurter suggested that the federal power to tax state activities is limited to "nondiscriminatory" taxes. He went on to explain this concept as follows:

"There are, of course, State activities and State-owned property that partake of uniqueness from the point of view of intergovernmental relations. These inherently constitute a class by themselves.

applicable to this case. Since the time of Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23 (1824), the Supreme Court has recognized that the commerce power is less restricted than the federal taxing power, and it has held that the standards developed to define the boundaries of state immunity from federal taxation are inapplicable to federal regulation of state activities under the Commerce Clause. See United States v. California, *supra,* 297 U.S. at 185, 56 S.Ct. 421. In New York v. United States, *supra,* the Court sharply limited that traditional immunity, and in dicta Justice Frankfurter stated that "the power of Congress to lay taxes has impliedly no less a reach than the power of Congress to regulate commerce." *Ibid.* 326 U.S. at 582, 66 S.Ct. at 314. The concern with state sovereignty expressed in that case has never been echoed, however, in subsequent cases involving the commerce power. On the contrary, in Parden v. Terminal Ry. of the Alabama State Docks Department, *supra,* 377 U.S. at 192, 84 S.Ct. at 1212, the Supreme Court stated:

> "By empowering Congress to regulate commerce, then, the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation."

Furthermore, as noted above at p. 259, Maryland v. Wirtz casts doubt on the validity of a challenge to the federal commerce power made in terms of "interference with sovereign state functions."

After careful consideration, we do not find that the implementation plan here under attack conflicts with the proper functioning of the system of federalism embodied in our Constitution. It is true, of course, that such enforcement may be financially burdensome, but that fact is irrelevant, for "when Congress does act [under the commerce power], it may place new or even enormous fiscal burdens on the States." Employees of the Department of Public Health and Welfare v. Department of Public Health and Welfare, *supra,* 377 U.S. at 284, 93 S.Ct. at 1618. It is also true that compliance with the plan will require the Commonwealth to exercise its legislative and administrative powers, for that is the means by which a state regulates its transportation system. However, it must not be forgotten that when dealing with the commerce power, "we are guided by practical considerations." Overstreet v. North Shore Corp., 318 U.S. 125, 128, 63 S.Ct. 494, 496, 87 L.Ed. 656 (1943). In enacting the Clean Air Amendments of 1970, Congress created an interlocking governmental structure in which the Federal Government and the states would cooperate to reach the primary goal of the Act—the attainment of national ambient air quality standards. Under its provisions, state and local governments retain responsibility for the basic design and implementation of air pollution strategies, subject to approval and, if necessary, enforcement by the Administrator. We believe that this approach represents a valid adaption of federalist principles to the need for increased federal involvement. The only alternative implementation would be for the Federal Government to assume some of the functions of traffic control and vehicle registration and directly enforce

---

Only a State can own a Statehouse; only a State can get income by taxing. These could not be included for purposes of federal taxation in any abstract category of taxpayers without taxing the State as a State."
New York v. United States, *supra* at 582, 66 S.Ct. at 314. Speaking for four members of the Court, Chief Justice Stone rejected an analysis based on discrimination:
"If we are to treat as invalid, because discriminatory, a tax on 'State activities and State-owned property that partake of

uniqueness from the point of view of intergovernmental relations,' it is plain that the invalidity is due wholly to the fact that it is a State which is being taxed so as unduly to infringe, in some manner, the performance of its functions as a government which the Constitution recognizes as sovereign."
*Ibid.* at 588, 66 S.Ct. at 317. Thus, it is evident that the limits of the federal power to tax state activities are also "to some extent undefined." *Ibid.*

the programs contained in the various transportation control plans. The Administrator has determined that this would not be a practicable way of attaining national air quality standards, see page 257, *supra,* and we fail to see how this would represent less of an intrusion upon state sovereignty.

■ We therefore conclude that the application of the federal enforcement procedures to the Commonwealth for noncompliance with the regulations contained in the Pennsylvania Transportation Control Plan is a valid exercise of the federal commerce power. We recognize that there may remain a legitimate concern for possible intrusions upon the proper functioning of our federalist system as a result of future developments in the implementation of the Clean Air Act, and this court will remain ready to protect that concern in any appropriate case. However, as Justice Frankfurter cautioned in New York v. United States, *supra,* 326 U.S. at 583, 66 S.Ct. at 314.

> "The process of Constitutional adjudication does not thrive on conjuring up horrible possibilities that never happen in the real world and devising doctrines sufficiently comprehensive in detail to cover the remotest contingency."

Thus, the extent to which each of the specific sanctions provided in § 113 (see note 16 above) may be imposed on a state or its representatives can more appropriately be determined in a specific case on a definite record.

For the foregoing reasons, that part of 40 C.F.R. § 52.2039(b) which makes the air bleed retrofit program applicable to the Allegheny County portion of the Southwest Pennsylvania Air Quality Control Region will be set aside; in all other respects the Petition for Review will be denied, since the remainder of 40 C.F.R. § 52.2039 and the federal enforcement procedures set forth in § 113 of the Clean Air Act and applied to the Pennsylvania Transportation Control Plan by 40 C.F.R. § 52.23 are valid.